**NATIONAL PAINT & COATINGS ASSOCIATION, INC.,**
Plaintiff,

v.

**SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,**
Defendants.

No.  CV04–02213DDP(SSX).

United States District Court,
C.D. California.

May 7, 2007.

■■■■■■■■■■■■■■■■■■■

Jeffrey B. Margulies, Rachel D. Stanger, Fulbright and Jaworski, Los Angeles, CA, for Plaintiff.

Barbara B. Baird, William B. Wong, Diamond Bar, CA, Daniel P. Selmi, Daniel P. Selmi Law Offices, Los Angeles, CA, Mark I. Weinberger, Shute Mihaly & Weinberger, San Francisco, CA, for Defendants.

## ORDER DENYING WRIT OF MANDATE

PREGERSON, District Judge.

This matter comes before the Court on petitioner National Paint & Coatings Association, Inc.'s petition for writ of mandate. After reviewing the materials submitted by the parties and hearing the parties' trial arguments, the Court denies the petition.

## I. Background

### A. *Factual History*

The petitioner, National Paint & Coatings Association, Inc. ("NPCA"), alleges that the respondent, South Coast Air Quality Management District ("SCAQMD"), acted outside the scope of its authority in adopting amendments to regulations governing architectural coatings.[1] (Petr.'s Br. 1:3–20.) The petitioner is a national trade association that represents the manufacturers of more than 90% of the architectural coatings sold in the United States.

(*Id.* 1:21–25.) The respondent is the local agency tasked by the California legislature, pursuant to the federal Clean Air Act ("CAA") and the California Clean Air Act, with regulating air pollution from stationary sources in Orange County and the urban portions of Los Angeles, Riverside, and San Bernardino counties. (*Id.* 3:12–17.)

As the California Courts have recognized, "the paint industry has extensively litigated attempts by the SCAQMD and other agencies to regulate the harmful effects of paints on the environment ...." *Sherwin–Williams,* 86 Cal.App.4th at 1263, 104 Cal.Rptr.2d 288. The amendments challenged here, adopted in 2003, lowered the acceptable concentration of volatile organic compounds (VOCs) in five categories of architectural coatings: roof coatings, clear wood finishes, waterproofing sealers, waterproofing concrete/masonry sealers, and stains. (Petr.'s Br. 9:13; 10:1–14.) Architectural coatings represent a substantial source of volatile organic compound ("VOC") emissions in the South Coast Basin. (Resp.'s Br. 3:4–8.) When VOCs interact with nitrogen oxides[2] in the presence of sunlight, ozone is formed (*Id.* ll. 1–2); the South Coast Air Basin has the worst ozone levels in United States. (*Id.* 1:24–25.) High levels of ozone in the troposphere (the ground-level atmosphere) "'may cause biochemical and structural changes in the lung, paving the way for chronic respiratory disease.'" (*Id.* 2:2–6)(quoting *Allied Local and Regional Mfrs. Caucus v. U.S. Envtl. Prot. Agency,* 215 F.3d 61, 66 n. 1 (D.C.Cir.2000)). Children are particularly at risk with regard to

---

**1.** The amendments were to Rule 1113, which was adopted by SCAQMD in 1977 to regulate architectural coatings. *Sherwin–Williams v. South Coast Air Quality Mgmt. Dist.,* 86 Cal. App.4th 1258, 1264, 104 Cal.Rptr.2d 288 (Cal. Ct.App.2001).

**2.** Motor vehicles are the most significant anthropogenic source of nitrogen oxides in the United States (55%). U.S. Envtl. Prot. Agency, NOx: What is it? Where does it come from?, *available at* http://www.epa.gov/air/urbanair/nox/what.html (last visited March 29, 2007).

the health effects of ground-level ozone. (*Id.* 2:7–8.)

With respect to the 2003 amendments, SCAQMD's rule-making process was detailed in the Final Staff Report for Proposed Amended Rule 1113 (Staff Report), dated Dec. 5, 2003. (1 Admin. R. 190.) SCAQMD contends that it initially considered ten categories of architectural coatings for emission reductions, and ultimately determined that only the aforementioned categories "would result in significant cost-effective emission reductions." (*Id.*) Within the Staff Report, SCAQMD summarizes the data considered in the rule-making process.[3] (*Id.* 190–232.) These data include: surveys identifying coating category sales volumes, VOC content, and availability and market penetration of low VOC products; a study conducted under SCAQMD contract to develop, test, and demonstrate zero and low VOC coatings in the stain, waterproof sealer, and clear wood finish categories; a compilation of case studies published by the United States Environmental Protection Agency and the Midwest Research Institute regarding the conversion of twenty-five wood furniture facilities to lower VOC coating technologies; the existence of low-VOC coatings that meet the standards established by the Kitchen Cabinet Manufacturer's Association; performance assessments of existing technology (relying upon manufacturer-generated product data); and assessments of sites where low-VOC architectural coatings were applied. (*Id.*) The Staff Report also includes the comment letters SCAQMD received during the rule-making process, as well as SCAQMD's responses. (*Id.* 293–98; 2 Admin. R. 299–386.)

**B.** *Procedural History*

This action commenced on January 5, 2004, when NPCA filed a petition for writ of mandate in Orange County Superior Court challenging the 2003 amendments and alleging that SCAQMD's rule-making: (1) was in excess of its authority and arbitrary and capricious; (2) was in violation of the California Environmental Quality Act ("CEQA"); and (3) failed to include an adequate socioeconomic impact analysis. (Petr.'s Br. 7:25–28; 8:1.)

SCAQMD filed a notice of removal to federal court on Feb. 20, 2004. (*Id.* 8:5) NPCA responded with a motion to remand to state court on Mar. 20, 2004, which this Court granted. (*Id.* ll. 6–7) NPCA subsequently filed a motion to consolidate this case with a prior case challenging SCAQMD's 2002 amendments to Rule 1113; the state court granted the consolidation on Dec. 13, 2004. (*Id.* ll. 7–10.)

SCAQMD then filed a motion to dismiss NPCA's CEQA claims, which the state court granted on Jan. 31, 2005. (*Id.* ll. 13–15.) SCAQMD subsequently appealed this Court's remand order, and the Ninth Circuit vacated the order on July 27, 2006—returning the case to this Court's docket. (*Id.* ll. 16–19.)

## II. Legal Standard

The Ninth Circuit, in *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir.2001), established the standard of review generally applied in diversity actions such as this:

> "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum. In doing so, federal

---

**3.** The parties contest the reliability of these data sources, as well as the degree to which

SCAQMD relied upon various individual sources.

courts are bound by the pronouncements of the state's highest court on applicable state law. Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." (citations and internal quotations omitted).

Thus, this Court looks to California precedent to determine the scope of SCAQMD's authority and whether SCAQMD exceeded this authority in adopting the 2003 amendments.

With respect to the latter question, the California Court of Appeal set forth the standard of review applied in challenges to non-CEQA[4] quasi-legislative decisions in *Sherwin–Williams:*

"[T]he trial does not inquire whether, if it had power to act in the first instance, it would have taken the action taken by the administrative agency. The authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully and procedurally unfair." 86 Cal.App.4th at 1267, 104 Cal.Rptr.2d 288.

In applying this standard, this Court "must ensure that [SCAQMD] has adequately considered all relevant factors and has demonstrated a rational connection between those factors, the choice made, and the purpose of the enabling statute." *Car-*

*rancho v. Cal. Air Res. Bd.,* 111 Cal. App.4th 1255, 1274, 4 Cal.Rptr.3d 536 (Cal. Ct.App.2003). In reviewing the factors considered by an agency in rule-making, the choice between conflicting expert analysis is for the agency, not the courts. *W. States Petroleum Ass'n v. South Coast Air Quality Mgmt. Dist.,* 136 Cal.App.4th 1012, 1023, 39 Cal.Rptr.3d 354 (Cal.Ct.App. 2006). In sum, traditional mandamus "may be used to compel an agency to exercise its discretion, but not to control it." *Carrancho,* 111 Cal.App.4th at 1268, 4 Cal.Rptr.3d 536.

### III. Discussion

#### A. *The Scope of SCAQMD's Authority*

■ Section 40440(a) of the California Health and Safety Code provides that "[t]he south coast district [SCAQMD] board shall adopt rules and regulations that carry out the [Air Quality Management] plan and are not in conflict with state law and federal laws and rules and regulations."[5] Section 40440(b)(1) provides that rules and regulations adopted pursuant to subdivision (a) must "[r]equire the use of ... best available retrofit control technology ["BARCT"] for existing sources." The parties do not dispute that the BARCT requirement applies to SCAQMD's regulation of existing architectural coatings manufacturers. SCAQMD contends, however, that the California leg-

---

**4.** CEQA statutorily prescribes a "substantial evidence" standard of review. *Western States Petroleum Ass'n v. Superior Court of Los Angeles County,* 9 Cal.4th 559, 564, 38 Cal.Rptr.2d 139, 888 P.2d 1268 (1995). SCAQMD recognized the difference between CEQA and non-CEQA rule-making in its opposition brief—noting that the Court in *Sherwin–Williams* applied a more stringent standard in analyzing feasibility in the CEQA context. (Resp.'s Br. 26:8–10.) At trial, however, SCAQMD agreed that the applicable standard was whether its rule-making was supported by substantial evidence. (Resp.'s Trial Presenta-

tion 22.) Curiously, SCAQMD cites a CEQA case for this standard, and defines substantial evidence pursuant to the definition in the CEQA Guidelines. Cal.Code Regs. Tit. 14, § 15384(a). The Court notes that this is not a CEQA case, and—as in *Sherwin–Williams*—the Court reviews SCAQMD's rule-making as a non-CEQA quasi-legislative decision under the arbitrary and capricious standard.

**5.** Unless stated otherwise, all proceeding statutory references are to the California Health and Safety Code.

islature intended § 40440(b) as a minimum obligation—rather than a cap—on SCAQMD's rule-making. (Resp.'s Br. 10:1–2.) Indeed, SCAQMD argued at trial that the California legislature has delegated full authority, subject only to rational basis review, to SCAQMD to adopt the rules and regulations necessary to ensure compliance with the federal Clean Air Act and the California Clean Air Act. NPCA asserts, in contrast, that the legislature did not intend SCAQMD to exceed BARCT in the regulation of existing sources. (Petr.'s Rep. Br. 14.)

The California Courts have thus far declined to rule on the scope of SCAQMD's rule-making authority. *See Western States,* 136 Cal.App.4th at 1019, 39 Cal. Rptr.3d 354 (noting that the Court "need not address whether or to what extent the District has the statutory authority to adopt 'technology-forcing' rules" as the control measures in question were determined by consultants to be achievable under the 'right circumstances'); *see also Dunn–Edwards Corp. v. South Coast Air Quality Mgmt. Dist.,* 19 Cal.App.4th 536, 546, 24 Cal.Rptr.2d 99 (1993)(affirming demurrer, for lack of remedy against named defendant, to plaintiff's cause of action alleging that "technology-forcing provisions of the Rule Amendments deprived them of property in violation of the due process clause of the California Constitution"). Similar to the Court in *Western States,* this Court need not decide the full scope of SCAQMD's authority unless that question is before the Court. Thus, unless the Court finds that the 2003 amendments *actually*

exceeded BARCT, the Court need not rule on whether BARCT was intended as a minimum obligation or a cap. Accordingly, this Court assumes, for the purposes of deciding whether the 2003 amendments exceeded BARCT, that BARCT restricts SCAQMD's authority. The question of what a hypothetical BARCT cap would require, however, remains unanswered.

Section 40406 defines BARCT as "an emission limitation that is based on the maximum degree of reduction achievable, taking into account environmental, energy, and economic impacts by each class or category of source." The parties disagree, however, on the interpretation of this definition, and the California Courts have thus far refrained from interpreting BARCT or best available control technology ("BACT").[6] (Petr.'s Trial Presentation 11.) NPCA argues that BARCT requires SCAQMD to adopt control measures that are technologically feasible for all applications within a regulated category (e.g. stains).[7] (Petr.'s Br. 28–29.) SCAQMD contends, assuming *arguendo* that BARCT imposes any limitation on rule-making, that BARCT does not require SCAQMD to determine that the feasibility of a control measure on an application by application basis. (Resp.'s Br. 22:5–20.)

NPCA's proffered BARCT interpretation is untenable. First, the "application by application" interpretation runs contrary to the plain meaning of § 40406. *See* 58 Cal. Jur.3d Statutes § 92 (2006) (recognizing that, "[g]enerally the courts are to give statutory words their plain or literal meaning"). As NPCA notes, the

---

**6.** § 40440(b)(1) requires the use of BACT for new and modified sources.

**7.** The Court notes that the term "feasibility" is found nowhere on the face of § 40406 (defining BARCT). NPCA argues in part that, since § 40406 requires control measures to be "available" and emissions reductions to be "achievable," the Legislature must have in-

tended BARCT control measures to be technologically feasible. (Petr.'s Br. 28:17–19.) NPCA also argues that additional statutes within Chapter 5.5 of the Cal. Health & Safety Code (which governs SCAQMD), as well as the remainder of the language in § 40406, evidence the Legislature's intent that BARCT control measures be feasible. (*Id.* 28–29.) These statutes will be addressed subsequently.

California Courts have recognized the usefulness of dictionary definitions in determining the plain meaning of words. (Petr.'s Rep. Br. 5:3–6)(citing, as an example, *People ex rel. Lungren v.Super. Ct.*, 14 Cal.4th 294, 302–03, 58 Cal.Rptr.2d 855, 926 P.2d 1042 (1996)). BARCT is defined as an emission limitation "based on the maximum degree of reduction achievable ... for each *class or category of source.*" § 40406 (emphasis added). The Oxford English Dictionary defines class, as used in § 40406, as "a number of individuals (persons or things) possessing common attributes, and grouped together under a general or 'class' name; a kind, sort, division." (2d ed.1989).[8] Similarly, the term category is defined as "a class, or division, in any general scheme of classification." *Id.*[9] Thus, the plain meaning of the statute suggests that a BARCT control measure need only be shown achievable for a group or division *of* applications.

Moreover, SCAQMD's argument that NPCA's proffered feasibility standard would be "effectively be impossible to meet" is persuasive. (Resp.'s Br. 22:5–15.) SCAQMD contends that, under the NPCA interpretation, SCAQMD "would have to demonstrate for all its air pollution-reduction rules feasibility for every conceivable application." (*Id.*) Indeed, if this Court accepts NPCA's contention that SCAQMD should have separately demonstrated the feasibility of both horizontal and vertical applications of low VOC stains, it is difficult to conceive of a logical stopping point for such arguments. (Petr.'s Br. 37:1–8.) Moreover, an interpretation of BARCT that would undermine SCAQMD's rulemaking authority to such an extent is inconsistent with legislative intent. As SCAQMD recognizes in the Opposition Brief (Resp.'s Br. 6:6–8), the California Senate intended the amendments establishing BACT and BARCT to "encourage more aggressive improvements in air quality and give the district new authority to implement such improvements."[10]

Having determined that BARCT does not require an application-specific feasibility determination, the Court turns to the question of what BARCT *does* require. As a threshold matter, the Court notes that the term "feasibility" is not found within the definition of BARCT.[11] *See* § 40406. The plain meaning of the word "achievability," however, is quite similar to that of feasibility. The Oxford English Dictionary defines achievability as "capable of being achieved." (2d ed.1989).[12] Thus, the plain meaning of achievability is capable of being "completed" or "accomplished." *Id.* (defining "achieved").[13] The

---

8. *Available at:* http: //dictionary.oed.com/cgi/entr y/50040921?query_type=word & query-word=class & first=1 & max_to_ show=10 & sort_type=alpha & result_place=1 & search_id=6hzI–Ra63bA–11027 & hilite=50040921 (last visited March 29, 2007).

9. *Available at:* http: //dictionary.oed.com/cgi/entr y/50034564?single=1 & query_type=word & queryword=category & first=1 & max_to_show=10 (last visited March 29, 2007).

10. (Req.Jud.Not., exh. 3, 20.) Section 40440(b)(1), establishing BACT and BARCT, was added to the Cal. Health & Safety Code pursuant to Senate Bill 151. (Resp. Br. 5:16–20.)

11. SCAQMD's contention that a feasibility finding is required by other Cal. Health & Safety Code Statutes will be addressed subsequently.

12. *Available at:* http://dictionary.oed.com/cgi/entry/50001676/50001676se1?single=1 & query_type=word & queryword =achievability & first=1 & max_to_show=10 & hilite=50001676sel (last visited March 29, 2007).

13. *Available at:* http://dictionary.oed.com/cgi/entry/50001679?single=1 & query_type=word & queryword=achieved &

word feasibility, in comparison, is defined as "capable of being done." *Id.*[14] As a result, the Court need not concern itself with this semantic dilemma. The Court prefers to proceed in its analysis according to the language of § 40406, however, using the term achievability rather than "feasibility."[15]

The Court next turns to the practical question, in its interpretation of BARCT, of how achievability may be demonstrated. First, it is uncontroversial that achievement in *practice* is highly relevant in demonstrating the achievability of a control measure. *See Sherwin–Williams*, 86 Cal. App.4th 1258, 1271, 104 Cal.Rptr.2d 288 (citing the availability of compliant products as evidence of achievability). Indeed, achievement in practice has been recognized by the Legislature as an acceptable means of demonstrating achievability for best available control technology ("BACT") determinations.[16] § 40405(b)(2). SCAQMD contends, however, that "achievable ... does not [only] mean[ ] already achieved." (Resp.'s Br. 23:6.) The Court agrees with this contention, and recognizes that SCAQMD may consider evidence of

achievability beyond achievement in practice. *See, e.g., Western States*, 136 Cal. App.4th at 1019–22, 39 Cal.Rptr.3d 354 (considering, in addition to the achievement in practice of the challenged emissions limitation, the opinion of a consultant that other refineries *could* achieve the limitation under the right circumstances); *see also Sherwin–Williams*, 86 Cal.App.4th at 1278, 104 Cal.Rptr.2d 288 (considering, as evidence of feasibility, studies demonstrating technologies that "could ... be used for development of zero-VOC coatings").

Next, having established a starting point for defining achievability, the Court turns to the question of what the Legislature intended in requiring SCAQMD to "tak[e] into account environmental, energy, and economic impacts" in BARCT determinations.[17] The Oxford English Dictionary defines the word "account," as used in § 40406, as an "estimation [or] consideration." (2d ed.1989).[18] Thus, one possible interpretation of this language is that it requires only *procedural* consideration. Under such an interpretation, SCAQMD could simply *consider* environmental, energy, and economic impacts, and then prescribe control measures independent of this consideration.[19] A second plausible

first=1 & max_to_show=10 (last visited March 29, 2007).

14. *Available at:* http://dictionary.oed.com/cgi/entry/50001679?query_type=word & query-word=achievability & first= 1 & max_to_show=10 & single=1 & sort_type=alpha (last visited March 29, 2007).

15. The Court seeks to avoid the confusion generated by NPCA's deviation from the language of § 40406, as well as that generated by NPCA's failure to provide a definition for the phrase "technological feasibility." (*See* Petr.'s Br. 28–29.)

16. BACT governs new and modified sources under § 40440(b)(1), and is defined as an emission limitation that "will achieve the lowest achievable emission rate ["LAER"]." § 40405. Section 40405(b) defines LAER as one of the following: "(1) The most stringent emission limitation that is contained in the

state implementation plan for the particular class or category of source, unless the owner or operator of the source demonstrates that the limitation is not achievable[;][or] (2) The most stringent emission limitation *achieved in practice* by that class or category or source."

17. The Court notes that NPCA does not assert that the 2003 amendments would result in negative environmental or energy impacts.

18. *Available at:* http://dictionary.oed.com/cgi/entry/50001357?query_type=word & query-word=account & first=1 & max_to_show=10 & sort_type=alpha & result_place=1 & search_id=zVsY–MOS8IP–15745 & hilite=50001357 (last visited March 29, 2007).

19. Indeed, NPCA's trial counsel actually acknowledged that rule-making could proceed in a similar fashion during trial.

interpretation of this phrase is that it requires SCAQMD to *incorporate* consideration of environmental, energy, and economic impacts into its' determination of whether a specific control measure is achievable. Regardless, the Court need proceed no further. Even assuming *arguendo* that the more restrictive interpretation applies, the Court holds that SCAQMD's adoption of the 2003 amendments did not exceed BARCT. Before reviewing the sufficiency of SCAQMD's BARCT determination, however, the Court must address the applicability of several statutes in contention.

NPCA cites several Cal. Health & Safety Code statutes in support of its contention that the 2003 amendments were required to be "feasible."[20] (Petr.'s Brief 28–29.) SCAQMD, in turn, attempts to refute the applicability of these statutes. (Resp.'s Brief 12–16.) As a threshold matter, the Court's construction of BARCT renders these statutes largely superfluous. Nevertheless, the Court addresses their applicability.[21]

First, NPCA correctly contends that § 40440(e) requires SCAQMD to consider cost-effectiveness in the rule-making process. Section 40440(e) requires SCAQMD to "comply with Section 40703" in the adoption of *any* regulation. Section 40703 requires that "[i]n adopting any regulation, the district shall *consider*, pursuant to Section 40922, and make available to the public, its findings related to the cost-effectiveness of a control measure, as well as the basis for the findings and consider-

ations involved." Notably, this is the only statutory claim that SCAQMD does not dispute. As SCAQMD is already required to take economic impacts "into account" pursuant to § 40406 (BARCT), however, the mandate of this provision is largely overlapping with § 40440(b)(1).[22]

NPCA additionally contends that the remaining requirements of § 40922(b) are applicable to the SCAQMD amendment process. (Petr.'s Br. 28:11–15.) Thus, NPCA argues, SCAQMD was required to consider "technological feasibility" in adopting the 2003 amendments. (*Id.* 28:5–6.) Section 40922 requires that "[i]n developing an adoption and implementation schedule for a specific control measure, the district shall consider [in addition to cost-effectiveness] . . . other factors including, but not limited to, *technological feasibility*, total emission reduction potential, the rate of reduction, public acceptability, and enforceability." (emphasis added). In *Sherwin–Williams*, the California Court of Appeal considered whether § 40703 incorporated the entirety of § 40922 into the SCAQMD amendment process, and ultimately determined that § 40922 applied solely to "SCAQMD planning processes and [the] adoption of its AQMP [Air Quality Management Plan]." 86 Cal.App.4th at 1268–71, 104 Cal.Rptr.2d 288. The Court therefore held that, since Sherwin–Williams Co. never challenged the applicable air quality management plan, its § 40922 challenge[23] to the SCAQMD amendment process was waived. *Id.* at 1271, 104 Cal.Rptr.2d 288. NPCA

---

**20.** In doing so, NPCA complicates its arguments by interchangeably using regulatory "terms of art," such as commercial feasibility, technological feasibility, cost-effective, achievable, and efficient, without differentiating amongst these terms of specifying their relationship to "feasibility." (*Id.*)

**21.** With regard to the applicability of § 40723, the plain language of the statute

indicates that it applies to the establishment of BACT control measures—not BARCT.

**22.** For the same reason, the Court need not address § 40440(c).

**23.** Sherwin–William's challenged SCAQMD's findings of public acceptability and technologically feasible.

does not contend that it preserved its right to a § 40922 challenge by initially challenging the applicable management plan. Regardless, even if NPCA's § 40922 challenge was preserved, the Court holds that SCAQMD has complied with BARCT. Thus, as the plain meaning of achievability is virtually indistinguishable from that of "feasible," the 2003 amendments were technologically feasible.[24]

Finally, NPCA contends that the language contained in § 40916 is evidence that the Legislature intended SCAQMD to adopt only feasible control measures. Section 40916(d)(1) grants authority to the California Air Resources Board (CARB) to "recommend a suggested control measure . . . for any architectural paint or coating" provided that CARB determines that the control measure is "commercially and technologically feasible and necessary." NPCA contends that "[i]t would be absurd" to conclude that CARB may only recommended feasible control measures, while SCAQMD possesses the authority to adopt unfeasible measures pursuant to § 40440. (Petr.'s Br. 28:25–27.) Section 40916(d)(2) plainly states, however, that "[n]othing in this subdivision shall limit or affect the ability of a district [e.g. SCAQMD] to adopt or enforce rules related to architectural paint or coatings." Thus, NPCA's argument has been explicitly foreclosed by the Legislature.

### B. SCAQMD Did Not Exceed Its Authority in Adopting the 2003 Amendments to Rule 1113

NPCA argues, in essence, that SCAQMD's determination that the 2003 Amendments were BARCT was based on insufficient evidence of product availability and performance. Therefore, NPCA contends that the adoption of the 2003 amendments was arbitrary and capricious.[25] (Petr. Brief 25:17–28; 26:1–16.) To review, the Court proceeds in analyzing this claim under the following assumptions: (1) Section 40440(b)(1), establishing BACT/BARCT, was intended by the Legislature to *cap* SCAQMD's rule-making authority; and (2) BARCT requires SCAQMD to *incorporate*, in determining whether a control measure is capable of being achieved, consideration of the control measure's environmental, energy, or economic impacts. The Court holds that SCAQMD's adoption of the 2003 amendments to Rule 1113 was not arbitrary and capricious, as SCAQMD presented sufficient evidence that the prescribed VOC limits were achievable.

As noted, the architectural coatings industry has extensively litigated SCAQMD's efforts to reduce the allowable concentration of VOCs in coatings. *Sherwin–Williams*, 86 Cal.App.4th at 1263, 104 Cal.Rptr.2d 288. Neither the parties nor the Court, however, are aware of any Cali-

---

24. Indeed, a plausible argument could be made that—with the inclusion of the "taking into account" clause—BARCT is somewhat more stringent than a simple feasibility.

25. NPCA initially argues that the 2003 amendments cannot be BARCT, because there was insufficient evidence to justify the adoption of measures more stringent than suggested control measures developed by CARB in 2000. (Petr.'s Br. 32:3–19; 33:1–15.) NPCA contends that since the control measures suggested by CARB were adopted by twenty-two air quality management districts, and were "explicitly determined" to be BARCT by the

Sacramento and Bay Area districts, SCAQMD should be required to make a showing of why they were not stringent enough for the South Coast Basin. (*Id.* 33:3–6.) SCAQMD counters, and NPCA does not dispute, that "BARCT is an evolving standard dependent upon technological advances, which may also vary between air districts depending upon their specific environmental, energy, and cost considerations." (Resp. Br. 21:28; 22:1–2.) Accordingly, this issue need not be resolved separately from the larger question: whether SCAQMD's determination that the 2003 amendments were BARCT was arbitrary and capricious?

**1162**

fornia Supreme Court cases reviewing the sufficiency of evidence necessary to determine whether an air pollution standard is achievable or feasible. (Resp.'s Br. 25:19–21.) Though NPCA cites several cases arising under the federal Occupational Safety and Health Act("OSHA"), these cases offer little insight in the Court's highly fact-specific inquiry here; indeed, NCPA appears to cite these cases for the uncontroversial proposition that "OSHA rulemakings have been vacated where the agency did not make a specific record of the technological feasibility of a control." (Petr.'s Br. 30:9–13.) SCAQMD cites two California Court of Appeal decisions, however, that are analogous to the instant matter.

Most recently, in *Western States*, the Court of Appeal addressed the sufficiency of SCAQMD's determination that an emissions limitation affecting six *existing* oil refineries was "achievable." 136 Cal. App.4th 1012, 39 Cal.Rptr.3d 354. Though the Court of Appeal avoided discussion of § 40440 and BARCT, the appellate court's analysis is directly applicable here. As the Court of Appeal noted, the control measures required by SCAQMD in *Western States* were principally based on "test results from Refinery A, one of the six affected refineries." *Id.* at 1019, 39 Cal. Rptr.3d 354. Refinery A demonstrated, over a multi-year period, that it could consistently "me[e]t or better[ ]" the proposed emissions standards. *Id.* The Western

States Petroleum Association argued, in response, that Refinery's A's achievements were "not a fair indication" that the other five refineries could comply with the new limitations. *Id.* A consultant hired to evaluate the remaining refineries' capability of meeting the proposed limitations, however, concluded that the limitations were "technically feasible" under the right conditions. *Id.* at 1020, 39 Cal.Rptr.3d 354. In light of this evidence, as well as SCAQMD's inclusion of "escape routes" [26] in the new rule, the Court held that "substantial evidence" supported SCAQMD's determination that the new rule was achievable. *Id.* at 1020–22, 39 Cal.Rptr.3d 354.

Similarly, in *Sherwin–Williams*, the California Court of Appeal upheld SCAQMD's determination that 1996 amendments to Rule 1113 were "technologically feasible." 86 Cal.App.4th 1258, 104 Cal.Rptr.2d 288.[27] As discussed in the "Scope of SCAQMD's Authority" section, the *Sherwin–Williams* Court initially barred the claim that the 1996 amendments were infeasible on procedural grounds. *Id.* The Court concluded, nevertheless, that "[i]n complying with the mandates of CEQA ..., the SCAQMD [sufficiently] considered technological feasibility ...." *Id.* at 1270–71, 104 Cal. Rptr.2d 288. In addressing the sufficiency of SCAQMD's technological feasibility determination, the Court noted that flat paints (the regulated category) complying with the prescribed VOC limits were avail-

---

**26.** SCAQMD's "escape clauses" included: (1) a provision allowing, in certain circumstances, delayed compliance; (2) a provision allowing, where a refinery demonstrates that it cannot meet the prescribed limitation, emission of the pollutant at a level .001 grains per dry standard cubic foot higher—provided that .001 difference is mitigated with alternative control measures; and (3) a promise that SCAQMD would monitor progress and make adjustments if necessary. *Id.* at 1020–22.

**27.** Though NPCA seemingly prefers the term "technologically feasible" to "achievable," employing this phrase throughout its briefs and arguments, NPCA argues that the analysis of technological feasibility in *Sherwin–Williams* is inapplicable because "[s]ection 40440(b) and BARCT [are] not discussed." (NPCA Trial Presentation 15.) The Court does not find this argument persuasive, and further notes that the appellant's arguments in *Sherwin–Williams* closely resemble those of NPCA here. *See id.* at 1278–79, 104 Cal. Rptr.2d 288.

able at the time of the amendments, and that product data sheets demonstrated that these paints were comparable to non-compliant flat paints in terms of performance. *Sherwin–Williams,* 86 Cal.App.4th at 1279, 104 Cal.Rptr.2d 288. In its holding, the Court also relied upon studies demonstrating applicable technological advancements and statements by industry representatives indicating the achievability of the 1996 amendments. *Id.*

Since the question of whether SCAQMD had sufficient evidence to adopt the 2003 amendments is predominately category-specific, the Court addresses the sufficiency of the evidence in greater detail with respect to each coating category. Though NPCA largely devotes its arguments to broadly questioning the sufficiency of evidence spanning multiple categories, these criticisms are incorporated into the Court's category-specific review. (*See* Petr.'s Br. 33–38.)

### 1. *Roof Coatings*

#### (a) *Evidence Supporting the 50 grams/liter Limitation*

SCAQMD contends that its primary evidence, in lowering the acceptable VOC concentration of roof coatings to 50 g/L, was the applicability and performance of compliant coatings. In the year 2000, SCAQMD reports, compliant coatings comprised 51 percent of statewide sales volumes. (Resp.'s Br. 27:12–13) The product data sheets for these coatings, as SCAQMD notes, support the conclusion that these products performed capably and were widely applicable. (*Id.* ll. 13–16.); (*compare* 23 Admin R. 6549–6757 *with* 22 Admin. R. 6401–6548.)

#### (b) *NPCA's Criticism of the Evidence*

NPCA does not directly dispute the sufficiency of this evidence. (*See* Petr.'s Brief 25–38.) NPCA does, however, recount several specific industry comments, which—in essence—challenge the ability of waterborne roof coatings (which have lower VOC content than solvent-based coatings) to perform capably in various applications (*Id.* 13:17–28;14:1–15.)

#### (c) *Analysis*

First, the Court notes that the "achievement in practice" demonstrated here is more significant than that in *Western States,* where only one of six affected refineries had achieved the standard prescribed 136 Cal.App.4th 1012, 39 Cal.Rptr.3d 354. Moreover, the evidence is quite similar to that in *Sherwin–Williams*—where "flat paints were available" that complied with the prescribed limitations and product data sheets showed the acceptable performance of these products. 86 Cal. App.4th at 1278, 104 Cal.Rptr.2d 288. Further, as a logical matter, the fact that the *majority* of the roof coatings market belonged to compliant coatings is *prima facie* evidence of achievability. With respect to the industry comments noted by NPCA, the Court first recalls its conclusion that BARCT does not require SCAQMD to demonstrate achievability on an application by application basis within a regulated category. This interpretation notwithstanding, the Court notes that SCAQMD's responses to the industry comments included examples of compliant, capably-performing coatings for each performance issue raised. Accordingly, the Court holds that SCAQMD had more than sufficient evidence to lower the acceptable VOC concentration of roof coatings.

### 2. *Clear Wood Finishes*

NPCA devotes the bulk of its factual arguments to the clear wood finishes category, arguing that SCAQMD's decision to lower the acceptable VOC concentration in clear wood finishes (to 275 g/L) was arbitrary and capricious. (Petr.'s Br. 33–38.) NPCA also protests the elimination of the "small-container exemption," which al-

lowed clear wood finishes sold in smaller containers to have elevated VOC concentrations. (*See id.* 36:17–28.) As a threshold matter, the Court is persuaded by SCAQMD's argument that "if the 275 g/1 limit [for all clear wood finishes] is found feasible, NPCA must concede that the [small container] exemption's deletion does not pose a technologically feasibility issue." (Resp.'s Brief 28:24; 29:1–2.)[28] Thus, the Court begins by reviewing the sufficiency of the evidence supporting the 275 g/L limitation. As the parties' arguments significantly overlap with the remaining the categories, the Court's analysis is largely applicable for the "waterproofing sealers," "concrete/masonry sealers," and "stains" categories.

### (a) Evidence Supporting the 275 g/L Limitation

In the Opposition Brief, SCAQMD summarizes the evidence relied upon in adopting the new standard for clear wood finishes. (*Id.* 28–37.) First, SCAQMD reviews the availability, performance, and market share of compliant clear wood finishes. SCAQMD notes that, during the rule-making process, three technologies were being used to manufacture finishes with VOC concentrations of 275 g/L or less. (*Id.* 29:9–11.) Such products (ranging in VOC concentration from zero to 275 g/L) accounted for 36 percent of the total sales volume of clear wood finishes in the year 2000. (*Id.* 29:27–28; 30:1.) SCAQMD reports that the product data sheets for these finishes indicated comparable performance with non-compliant finishes. (*Id.* 29:24–27.) With the respect to "waterborne" finishes, the most widely used of the available compliant technologies, SCAQMD claims that product data sheets indicated excellent performance

and wide practical applicability. (*Id.* ll. 16–18.) Moreover, some waterborne products satisfied the testing requirements established by the Kitchen Cabinet Manufacturers Association. (*Id.* ll. 20–21; 1 Admin. R. 212.)

In addition, SCAQMD reports that its achievability determination was shaped by regular consultations with industry and "numerous" site assessments of locations where compliant finishes had been applied. (Resp.'s Br. 30:3–9.) With regard to the latter, SCAQMD reports that users of compliant of coatings spoke positively about the coatings' ease of application, performance, and durability. (*Id.* ll. 17–18; 1 Admin. R. 8–9; 3 Admin. R. 848–89.) SCAQMD's industry consultation included regular meetings with a "working group" to assess the ability of industry to comply with more stringent, as well as existing, regulations; notably, this working group included NPCA. (Resp.'s Br. 30:3–9.)

SCAQMD cites a technological assessment conducted pursuant to Rule 1136 amendments, as well as several EPA "cases studies," as further evidence of the achievability of the 275 g/L standard. (*Id.* 30:24–28; 31:1–24.) Rule 1136 was amended in 1996 to require, by year 2005, clear wood finishes applied to cabinets and furniture to meet a 275 g/L standard. (*Id.* 30:27.) In 2003, SCAQMD assessed the percentage of industries already in compliance with these amendments, and found that "a number of industries had successfully converted to low-VOC coatings well in advance of the 2005 limit." (*Id.* 30:28; 31:1–4.) Moreover, SCAQMD determined that approximately 48 percent of the facilities assessed were using some compliant finishes. (*Id.* 36:21–22; 12 Admin. R.

---

**28.** Indeed, it defies logic to contend that container-size is determinative of achievability. Further, the increasing sales of small containers, cited by NPCA as evidence that compliant products are not acceptable substitutes, strengthens the argument for eliminating this "loophole". (Resp. Br. 37:8–11.)

3464.) Notably, SCAQMD asserts that "many of the Rule 1136 products were actually being sold and successfully used in the field as Rule 1113 architectural coatings"—rendering this technological assessment directly applicable here. (Resp.'s Br. 31:19–21.) The EPA case studies cited by SCAQMD also focused on the ability of wood furniture facilities to "conver[t] to less polluting technologies." (*Id.* ll. 5–7.) SCAQMD highlights the example of a small facility in the South Coast Basin that converted to waterborne finishes with VOC contents of 275 g/L or less. (*Id.* ll. 7–16.) The owner of the facility reported that he was "very satisfied" with the conversion, and suffered no increase costs. (*Id.* ll. 12–13.) SCAQMD contends that, overall, the twenty-five EPA case studies support the achievability of the 275 g/L limitation for Rule 1113 clear wood finishes, as the studies "demonstrate that the hurdles in transitioning . . . [to compliant] coatings have been successfully overcome." (*Id.* 35:18–20.) SCAQMD admits, however, that only a few of the coatings products used in the EPA cases studies would be useable for under Rule 1113. (*Id.* 31:17–19.)

Next, SCAQMD reviews the "AVES study"—the subject of considerable NPCA criticism. In 1999, SCAQMD awarded a contract to AVES to "develop coatings with a 'zero or near-zero' VOC content for several coatings categories—including clear wood finishes." (*Id.* 32:1–4; 4 Admin. R. 937, 941.) AVES partnered with ADCO, an architectural coatings company that had previously developed a zero-VOC technology know as RESILEX. (*Id.* ll. 4–7.) RESILEX reportedly functioned as the "backbone resin" for the development of the SCAQMD-contract coatings. (*Id.* ll. 8–9.) SCAQMD contends that the resulting coatings, which had near-zero VOC content, were extensively tested in accordance with the standard prescribed by the American Society for Testing and Materi-

als ("ASTM"). (*Id.* ll. 13–20.) SCAQMD avers that, pursuant to these "widely accepted" test methods, the AVES coatings were generally comparable in performance to non-compliant coatings. (*Id.* ll. 15–20.) Furthermore, SCAQMD contends that independent painters, who performed a field demonstration using the AVES coatings, reported positively on the coatings' performance. (*Id.* ll. 21–25.)

Finally, SCAQMD cites a number of industry comments generally supporting the challenged rule. (*Id.* 32–34.)

### (b) NPCA's Criticism of the Evidence

First, NPCA attacks the AVES study as "insufficient and grossly biased." (Petr.'s Br. 33:16.) NPCA contends that the testing methods employed in the AVES study were merely "basic laboratory tests," and argues that field testing should have been employed to determine whether the AVES coatings "would continue to perform acceptably." (*Id.* 34:1–7.) NPCA also takes issue with the role of ADCO in the study, suggesting that ADCO's interest in commercially developing RESILEX resulted in bias. (*Id.* ll. 8–21) Although NPCA does not explicitly allege any wrong-doing, this inference is implicit in the following statement: "[U]nstated was the fact that the commercialization of coatings using this technology would have reaped handsome rewards to . . . ADCO." (*Id.* ll. 19–21.) Moreover, NPCA argues that, since "no such [RESILEX-based] products within in the coatings categories subject to the rule amendment were identified" by SCAQMD in the Staff Report, it was inappropriate for SCAQMD to rely on RESILEX technology to show that the 2003 emissions limitations were achievable. (*Id.* 34:22–28; 35:1–2.) Finally, NPCA argues that, absent peer review, the AVES study lacks credibility. (*Id.* 35:3–11.)

Next, NPCA attacks SCAQMD's reliance on the EPA case studies. NPCA contends that these studies "revea[l] little in the way of actual VOC levels of the products used, making comparisons" to the challenged limits difficult. (*Id.* ll. 16–17.) Moreover, NPCA highlights various technological differences that render the most of the wood finishing products discussed in the EPA case studies unusable for Rule 1113 purposes. (*Id.* 35:18–28; 36:1–3.) NPCA criticizes the Rule 1136 technology assessment in similar fashion, arguing that the assessment "reinforced industry's comments that the low-VOC products were not simple replacements for all existing uses in the clear wood finishes category." (*Id.* 38:3–8.) Primarily, NPCA emphasizes the fact that the majority of facilities were not using compliant Rule 1136 compliant products to support this conclusion. (*Id.* ll. 1–2.)

NPCA groups the remainder of its factual arguments as a challenge to SCAQMD's reliance on manufacturer-generated product data. (*Id.* 36:4.) NPCA argues that, in relying on such data, SCAQMD "improperly interpreted its statutory authority to allow it to adopt a rule without finding that the promised emissions reductions were in fact 'achievable.'" (*Id.* ll. 8–10.) The Court addresses several of these arguments in the subsequent analysis.

#### (c) Analysis

Sufficient evidence supported SCAQMD determination that the 275 g/L limitation was achievable under BARCT, as the evidence before the Court exceeds that before the California Court of Appeal in *Western States*, 136 Cal.App.4th 1012, 39 Cal. Rptr.3d 354, and *Sherwin–Williams*, 86 Cal.App.4th 1258, 104 Cal.Rptr.2d 288. First, NPCA does not dispute the fact that 36 percent of the market share of clear wood finishes belonged to compliant products, nor does NPCA dispute SCAQMD's characterization of the associated product data sheets. Moreover, the existing compliance rate demonstrated here (36 percent sales volume) compares favorably to that in *Western States* (one of six refineries). 86 Cal.App.4th 1258, 104 Cal.Rptr.2d 288; *see also Sherwin–Williams* (holding only that compliant products were available, and specifying *no* compliance rate). Though NPCA criticizes the reliability of product data sheets, the Court in *Sherwin–Williams* recognized these materials as acceptable evidence of performance in analyzing "technological feasibility" under CEQA. *Id.* at 1270, 1278, 104 Cal.Rptr.2d 288.

As in *Western States*, SCAQMD also provided several "escape routes" to the 2003 amendments, including: (1) sales of non-compliant coatings under an averaging option; (2) A three year sell-through clause (compliance was delayed until at least July 1, 2006 for all products except roof coatings); and (3) continuing technology assessments for "a number of the challenged limits." (Resp.'s Br. 39:1–15.) In addition, the record contains numerous industry comments in support of the 275 g/L emission limitation.[29] (*Id.* 32–34.); *see Sherwin–Williams*, 86 Cal.App.4th at 1278, 104 Cal.Rptr.2d 288 (highlighting

---

**29.** The Court also notes that the record is replete with negative industry comment. (Petr.'s Br. 11–25.) The Court's role in resolving evidentiary conflict, however, is limited. The Court's examines the record to determine whether SCAQMD's decision was "arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedur- ally unfair"—not to second guess the weight SCAQMD assigns to conflicting evidence. *Sherwin–Williams*, 86 Cal.App.4th at 1267, 104 Cal.Rptr.2d 288. Regardless, the Court views the positive industry comment as only a fraction of the evidence in support of SCAQMD's rule-making.

supportive industry comment). On the basis of the market penetration, product data sheets, the inclusion of escape routes, and supportive industry comment alone, California precedent supports the Court's determination that the 275 g/L VOC limitation for clear wood finishes was not arbitrary and capricious. The record of relevant evidence, however, is not limited to these items.

SCAQMD contends that the AVES study further "supports the feasibility of the [amended] Rule's limits." The Court agrees. First, the Court notes that the AVES study involved architectural coatings with near-zero concentrations of VOCs. As such, the study is most logically characterized as a relevant *demonstration* of what is "capable of being done or accomplished"—rather than the "basis" for the SCAQMD's adoption of the 275 g/L limitation. (Petr.'s Br. 33:21.); *See* Oxford English Dictionary (2d ed.1989) (defining achievability).[30] Indeed, the record supports SCAQMD assertion that the study was "merely an example of performance capabilities of a low VOC-products [sic]." (*Id.* ll. 22–23; 2 Admin. R. 346.) Accordingly, even if the Court accepts NPCA's contention that RESILEX-based coatings were not commercially available during the rule-making period[31], it does not follow that SCAQMD's reliance on the study as relevant evidence of achievability was arbitrary (*Id.* 34:28.) NPCA has provided no authority to support the proposition that only *commercial* achievement is relevant in determining what is capable of being commercially achieved in the future. Further, though NPCA argues that the study was "grossly biased," NPCA presents no evidence to support this contention. The Court agrees with SCAQMD that the use of ASTM testing methodology, as well as

the study's conclusions (finding performance comparable to non-compliant finishes in some aspects and lacking in others), cuts against this contention. (Resp.'s Br. 35:4–14.) Although a peer-reviewed, independently performed study would certainly be stronger evidence of achievability than the AVES study, the Court sees no reason to view the study as irrelevant.

For similar reasons, the Court recognizes the relevance, as a part of the entire evidentiary record, of the EPA case studies, the Rule 1136 technology assessment, and the 2003 technology assessment. NPCA's piecemeal attack on this evidence is, in large part, devoid of perspective. Criticism of SCAQMD's 2003 technology assessment illustrates this flaw. NPCA contends that "a few site inspections . . . does [sic] not establish that such [low VOC] products performed acceptably, or acceptably over time, within the wide range of [possible] conditions." (Petr.'s Br. 37:19–23.) Obviously, SCAQMD does not claim that its site assessments *alone* were sufficient to support such a determination; rather SCAQMD contends that such assessments supported its determination that the 275 g/L limitation was achievable. The record demonstrates that these assessments were clearly only a *part* of the evidentiary record. NPCA does not contend that the site assessments are irrelevant as evidence of product performance, nor does it challenge the reliability of the positive reports collected during the site assessments. NPCA's arguments largely proceed in this manner, treating each item of evidence in the record as if it were the sole basis for SCAQMD's rule-making. In so doing, NPCA conflates relevance with perfection—and, implicitly, advocates a

---

30. *See* Oxford English Dictionary, *supra* note 12.

31. More precisely, NPCA contends that these products were not specifically identified. (*Id.* l. 28.)

rule-making standard that would be impossible to satisfy.

Furthermore, several of NPCA's arguments are simply illogical and/or completely lacking in support. NPCA claims, for example, that because 52 percent of the facilities surveyed pursuant to the Rule 1136 technology assessment were not using compliant products, the assessment does not support the achievability of the 275 g/L limitation.[32] (*Id.* 38:1–8.) Yet, by NPCA's admission, 48 percent of the facilities surveyed *were* using some compliant products. NPCA cannot seriously contend that only a majority market share is evidence of achievability. Indeed, such a construction of BARCT would virtually eliminate the need for regulation—as the majority of industry would already be compliant. Similarly, NPCA seems to suggest that SCAQMD should have conducted field studies to verify the performance of compliant products. (Petr.'s Rep. Br. 13:1–13.) This contention is at odds with the California Court of Appeal's reliance on product data sheets in *Sherwin–Williams*, however, as well as the Court's application of a "realistic requirement" to SCAQMD's rulemaking. 86 Cal.App.4th 1258, 1271, 104 Cal.Rptr.2d 288 ("appellants have not shown that data exists which the SCAQMD should have relied upon [in assessing public acceptability or technological feasibility], but did not"). NPCA highlights, as a final example, the continued use of "higher-VOC solvent-borne clear wood finishes sold in small containers" in support of its argument that compliant products do not perform acceptably. (*Id.* 36:17–20.) Any number of explanations, however, might account for this sales volume differential (e.g. a price, rather than performance, differential; consumer familiarity with an established product.)

More importantly, NPCA cites no authority for the proposition that market penetration is required to demonstrate achievability. *See Sherwin–Williams*, 86 Cal. App.4th at 1278, 104 Cal.Rptr.2d 288 (noting only that "flat paints were available" during rule-making, without citing whether these products had *any* market penetration).

3. *Waterproofing Sealers, Concrete/Masonry Sealers, and Exterior Stains*

   (a) *Evidence Supporting the Limitations*

As noted, much of the Court's analysis with respect to the "clear wood finishes" category is applicable to the remaining categories. This is because SCAQMD generally relied upon the same types of evidence in regulating each of the remaining categories: compliant product availability, market penetration, product data sheets, site assessments, and the AVES study. Moreover, SCAQMD included "escape routes" for each of the remaining categories. *Western States*, 136 Cal. App.4th at 1020–21, 39 Cal.Rptr.3d 354.

First, with regard to waterproofing sealers, SCAQMD lowered the acceptable VOC concentration to 100 g/L. (Petr.'s Br. 10:8–9.) SCAQMD notes that, during the rule-making process, "various technologies exist[ed] and [we]re in use to make numerous compliant waterproofing sealers." (Resp.'s Br. 37:19–20.) In the year 2000, compliant sealers accounted for approximately twenty percent of statewide sales volume. (*Id.* ll. 17–19.) Moreover, the product data sheets for these compliant coatings, as well as SCAQMD site assessments, indicated their comparable performance to non-compliant coatings. (*Id.* ll. 23–26.) Finally, the AVES study generated waterproofing sealers with near-zero

---

**32.** NPCA does not contest SCAQMD's assertion that many of the Rule 1136 technologies

could be used for Rule 1113 purposes.

VOC concentration that performed comparably under standardized testing. (4 Admin. R. 957.)

SCAQMD cites virtually identical evidence in support of its contention that the new limitations (100 g/L) for concrete and masonry sealers were achievable. (*Id.* 37:15–28; 38:1–4.) SCAQMD does note, however, that compliant concrete and masonry sealers accounted for 38 percent of statewide sales in the year 2000. (*Id.* 37:17–18.) Moreover, at least one industry representative commented favorably on the availability of compliant concrete and masonry sealers.

With respect to exterior stains, SCAQMD notes that compliant coatings accounted for 11 percent of statewide sales volume in the year 2000. (*Id.* 38:8–9.) As with concrete and masonry sealers, the remaining supportive evidence is indistinguishable to that recounted for waterproofing sealers. Notably, however, SCAQMD extended the date for compliance with the new exterior stain limitations to July 1, 2007—reportedly including this additional "escape route" in response to industry claims that more time was needed for product reformulation. (*Id.* ll. 19–24.)

### (b) NPCA's Criticism of the Evidence

As a threshold matter, the Court notes that the majority of NPCA's broadly-applicable arguments have been addressed within the "clear wood finishes" analysis. NPCA focuses little specific attention, independent of these broad arguments, on any category other than clear wood finishes. Indeed, the Court finds only one reference in NPCA's "Argument" section to an industry comment regarding the performance of exterior stains.[33]

### (c) Analysis

The Court holds that the evidence supporting SCAQMD's rule-making, with respect to waterproofing sealers, concrete/masonry sealers, and exterior stains, was sufficient. Clearly, the aforementioned evidence (available low-VOC products, market penetration, product data sheets and site assessments, the AVES study, industry comment, and the inclusion of escape routes) exceeds that held to be "substantial" in both *Western States* and *Sherwin–Williams*.[34] 136 Cal.App.4th 1012, 39 Cal.Rptr.3d 354, 86 Cal.App.4th 1258, 104 Cal.Rptr.2d 288. As the Court has extensively reviewed the holdings of these cases, as well as the evidentiary record, the Court refers the parties to the applicable portions of its prior analyses.

The Court deems it necessary, however, to address one of NPCA's remaining arguments. NPCA contends that SCAQMD has assigned undue weight to industry generated data supporting a "preordained conclusion," while ignoring industry comments that conflict with this predetermination. (Petr.'s Rep. Br. 9:27–

---

**33.** As the record contains evidence supporting the performance capability of exterior stains, the Court need not address this argument. Notably, however, this argument also exemplifies the "application by application" interpretation of BARCT rejected by the Court.

**34.** The Court recognizes that compliant exterior stains had the lowest market penetration, at 11 percent, of any of the five categories affected by the 2003 amendments. The Court has already noted, however, that its finds no authority requiring *any* showing of market penetration. To review, the California Court of Appeal in *Sherwin–Williams* relied largely on product availability and performance (according to product data sheets) in upholding SCAQMD's rule-making; the Court did not discuss whether, or to what extent, compliant products had any market share. 86 Cal. App.4th at 1278–80, 104 Cal.Rptr.2d 288. Furthermore, SCAQMD's decision to lower the acceptable VOC content of stains was supported by a myriad of additional evidence (product data sheets, site assessments, industry comment, and the AVES study).

28; 10:1–9.) NPCA fails, however, to differentiate between data generated by standardized testing and unsupported industry comment. NPCA's contention that product data sheets generated pursuant to ASTM-certified laboratory methods are mere "marketing materials" (*Id.* 10:1–2) is inapposite to the weight assigned to product data sheets by the California Court of Appeal. *See Sherwin–Williams,* 86 Cal.App.4th at 1279, 104 Cal.Rptr.2d 288. Furthermore, the record does not indicate that SCAQMD failed to consider negative industry comment. (*Id.*) In fact, NPCA's characterization of the comment period demonstrates the comprehensive and methodical nature in which SCAQMD addressed industry concerns. (Petr.'s Br. 11–25.) Insofar as NPCA contends that SCAQMD should have generated additional data to answer each of the concerns raised during the comment period, this argument is inapposite to California appellate precedent. *Sherwin–Williams,* 86 Cal.App.4th at 1271, 104 Cal.Rptr.2d 288 ("appellants have not shown that data exists which the SCAQMD should have relied upon [in determining whether emissions limitations were technologically feasible], but did not"). Moreover, to the extent SCAQMD considered conflicting industry opinions or testing data (revealingly, NPCA does not contend the latter), the choice between conflicting evidence of equivalent quality was for SCAQMD—not this Court. *Western States,* 136 Cal. App.4th at 1023, 39 Cal.Rptr.3d 354.

**C. *SCAQMD's Assessment of Socioeconomic Impacts was Adequate***

The parties do not dispute that § 40440.8 required SCAQMD to perform an assessment of the socioeconomic impacts of the 2003 amendments. Section 40440.8(a) requires that:

> Whenever the south coast district intends to propose the adoption, amendment, or repeal of a rule or regulation that will significantly affect air quality or emissions limitations, the district, to the extent data are available from the district's regional economic model or other sources, shall perform an assessment of the socioeconomic impacts of the adoption, amendment, or repeal of the rule or regulation.[35]

Pursuant to this mandate, SCAQMD conducted a socioeconomic impact assessment based on the estimated costs of product reformulation. (Petr. Br. 40:7–10.) SCAQMD calculated the costs of reformulation using the market price differential for compliant and non-compliant coatings. (*Id.*) In response to NPCA's contentions that the poor performance of compliant coatings would result in additional costs, SCAQMD contends that it "erred conservatively" in estimating product reformulation costs. (*Id.* l. 21.) SCAQMD generally disputes this assertion, however, arguing that data has not been provided "demonstrating a greater incidence of [compliant coating] failures." (*Id.* ll. 13–15.) Moreover, as detailed in the Court's prior analysis, SCAQMD has offered considerable evidence that compliant coatings perform acceptably in each of the regulated categories.

■ As a threshold matter, the Court holds that SCAQMD has presented substantial evidence that low-VOC coatings perform adequately—thereby undermining

---

**35.** Section 40440.8(b) limits socioeconomic impacts, for the purposes of analysis, to the following: "(1) The type of industries affected by the rule or regulation; (2) The impact of the rule or regulation on employment and the economy in the south coast basin attributable to the adoption of the rule or regulation; (3) The range of probable costs, including costs to industry, of the rule or regulation; (4) The availability and cost-effectiveness of alternatives to the rule or regulation, as determined pursuant to Section 40922."

the basis for much of NPCA's criticism of the socioeconomic impact assessment. Moreover, NPCA fails to *produce* any data with which the costs it argues for may be assessed. The California Courts have been clear in this requirement, noting in *Sherwin–Williams* that "appellants should have, but did not, affirmatively demonstrate that the needed data were available for the SCAQMD to conduct its [socioeconomic] studies." 86 Cal.App.4th at 1274–75, 104 Cal.Rptr.2d 288. More broadly, the *Sherwin–Williams* Court held that:

> The SCAQMD's duty to analyze data is based on a rule of reasonableness under *Alliance*, which requires it to utilize existing data available to it in order to make its projections. Appellants have not shown that the needed data were available but not used in the study, or that the SCAQMD failed to even attempt a study of socioeconomic effects, *as is required* to prove that the SCAQMD failed to fulfill the requirements of section 40440.8.

*Id.* at 1274, 104 Cal.Rptr.2d 288. (internal citations omitted)(emphasis added). Section 40440.8 does not require the assessment of socioeconomic impacts lacking supporting data, and it certainly does not require SCAQMD to assess unsupported socioeconomic impacts based on underlying claims that have been refuted (i.e. low-VOC product performance). *Alliance of Small Emitters/Metals Indus. v. South Coast Air Quality Mgmt. Dist.*, 60 Cal. App.4th 55, 64, 70 Cal.Rptr.2d 54 (Cal.Ct.App.1997)(noting that when "data are unavailable to make a reasonable projection of socioeconomic impact, the SCAQMD remains empowered to adopt regulations")

Further highlighting the adequacy of SCAQMD's socioeconomic analysis is its similarity to that conducted in *Sherwin–Williams*, as SCAQMD's assessment in that case was also based on reformulation costs calculated according to market price differential. 86 Cal.App.4th at 1273–74, 104 Cal.Rptr.2d 288. Notably, at the time SCAQMD's analysis was conducted in *Sherwin–Williams*, § 40440.8 was more stringent than the present version—and required SCAQMD to contract with an independent consultant to perform a "review and analysis" of SCAQMD's methods. *Id.* at 1271–72, 104 Cal.Rptr.2d 288. Pursuant to this requirement, the Massachusetts Institute of Technology validated SCAQMD's assessment in *Sherwin–Williams* and praised the competency of SCAQMD's staff. *Id.* at 1272, 104 Cal. Rptr.2d 288.

The Court proceeds, nevertheless, to briefly address NPCA's arguments. First, NPCA questions the market price differential used by SCAQMD, and argues that the record does not support SCAQMD's contention that it erred conservatively. (Petr.'s Br. 38:24–26.) SCAQMD clearly explains the basis for this estimates, however, in its "Final Socioeconomic Report." (2 Admin. R. 523–25.) Next, NPCA cites a single industry comment for the proposition that waterborne clear wood finishes would cost three times more than non-compliant, solvent-based finishes. (Petr.'s Br. 39:1–5.) Specifically, NPCA contends that Bonakemi brand floor finish would cost three times that of a solvent-based finish. (*Id.* ll. 5–6.) Fifteen lines later, however, NPCA cites Bonakemi's actual comment letter—in which Bonakemi claimed that the overall costs of jobs performed with waterborne finishes is *less* than that of non-compliant solvent-based finishes. (*Id.* ll. 20–22.) NPCA also cites an industry comment for the proposition that "raw material costs" for waterborne, compliant products will be elevated; this comment is premised on the argument that low VOC coatings will not perform adequately and will, thus, require repair or re-coating. (*Id.* ll. 7–16.) As the Court has noted, SCAQMD has sufficient-

ly refuted this contention. NPCA next names a litany of costs allegedly associated with the application of compliant clear wood finishes, and argues that these costs should have been incorporated into SCAQMD's socioeconomic analysis. (*Id.* 39:23–28; 40:1–10.) SCAQMD contradicts the existence of the "ease of application" differential resulting in these costs, however, noting that "user experience shows that compliant coatings are as easy to use and less hazardous to apply than non-compliant coatings." (Resp.'s Br. 40:27–28.)

In sum, NPCA has neither demonstrated that SCAQMD failed to attempt a study of socioeconomic impacts nor shown that SCAQMD ignored available data in its analysis. Absent such a showing, NPCA cannot prevail. *Sherwin–Williams,* 86 Cal.App.4th at 1274, 104 Cal.Rptr.2d 288.

## IV. Conclusion

For the foregoing reasons, the Court denies NPCA's petition for writ of mandate. The Court finds that, pursuant to California precedent and the plain meaning of § 40406 of the California Health & Safety Code (defining BARCT), SCAQMD presented sufficient evidence of the achievability of the 2003 amendments to Rule 1113. The Court also finds that SCAQMD adequately considered, in light of the available data, the socioeconomic impacts of the 2003 amendments.

IT IS SO ORDERED.