177 Cal.App.4th 1494 (2009)
NATIONAL PAINT & COATINGS ASSOCIATION, INC., Plaintiff and Appellant,
v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, Defendant and Respondent.
No. G040122.
Court of Appeals of California, Fourth District, Division Three.
September 29, 2009.
*1497 Fulbright & Jaworski, Jeffrey B. Margulies and William L. Troutman for Plaintiff and Appellant.
Shute, Mihaly & Weinberger, Matthew D. Zinn; Daniel P. Selmi; Kurt R. Wiese, Barbara B. Baird and William B. Wong for Defendant and Respondent.

*1498 OPINION
SILLS, P. J.

I. INTRODUCTION
A trade group, the National Paint & Coatings Association, Inc., has brought this action against the South Coast Air Quality Management District, challenging the district's 2002 amendments to its rule limiting the amount of volatile organic compounds allowed in various kinds of paint and coatings in Southern California.[1]
The challenged rule basically says: Here's a list of the maximum levels of volatile organic compounds that paint manufacturers may have in different kinds of paint and coatings, with the effective levels kicking in at various *1499 times.[2] The rule also has an averaging provision, similar to federal car mileage standards, which allows manufacturers to average the "actual cumulative emissions" of their paints and coatings so that the total emission can be under a hypothetical compliance limit, even if some of their paints and coatings are not.
The paint association's challenge is also conceptually simple enough: It asserts that the district has exceeded the authority given it by the statutes governing its authority to promulgate air pollution regulations, because the rule specifies limits that are not actually "available" and "achievable." (See Health & Saf. Code, § 40440, subd. (b)(1); § 40406.)[3]
As we explain below, the paint association's challenge fails as to all of the categories of paints and coatings governed by the rule, except for two. In a word, if it exists, it's both "available" and "achievable," even if there is not much of it by way of variety or market penetration. There is substantial evidence that there are floor coatings; industrial maintenance coatings; high temperature industrial maintenance coatings; nonflat coatings; primers, sealers *1500 and undercoaters; and quick-dry primers, sealers and undercoaters which both exist and comply with even the most recent limits (eff. July 2006) required under the rule. That is, technology complying with the limits is both available and achievable.
However, the administrative record shows there are zerocount `em, zeroproducts that comply with the most recent limits in two categories: quick-dry enamels and rust preventative coatings. We have no evidence that, in these categories, the technology is both "available" and "achievable" to comply with the district's amended limits; we have only speculation that one day in the future the technology will exist to comply with the limits.
We will therefore affirm the trial court in denying the paint association's requested writ of administrative mandate as to everything but these two categories. We will direct the writ to be granted as to quick-dry enamels and rust preventers, but with this proviso: Recognizing that, as we write in 2009 working with an administrative record largely based on information existing in late 2002 (and there's a reason for the long lag time, as will soon be apparent), instead of directing that the rule be vacated as to these two categories, the writ will conditionally give the district the opportunity to show, based on current technology, that quick-dry enamels and rust preventers can be made which comply with the most recent limits. Only if, after a hearing on remand, the district cannot show availability and achievability based on existing coatings in these two categories should a writ issue requiring the amended rule to be rolled back to earlier limits.[4]

*1501 II. THE HISTORY OF THE LITIGATION

A. National Paint Association I

As mentioned, the rule was first promulgated in 1977. The rule was amended in 1999. The amended rule put very restrictive limits on volatile organic compounds. Those amendments were quickly challenged, as exceeding the district's enabling statutes, by the paint association in the Orange County Superior Court, then later in this court.
The challenge resulted in an unpublished decision, National Paint & Coatings Association, Inc. v. South Coast Air Quality Management District (June 24, 2002, G029462) (nonpub. opn.) (National Paint Association I). In National Paint Association I, this court reversed a judgment denying the requested writ of administrative mandamus on procedural grounds. We noted that, at the very last momentthat is, within about 10 days before the hearing at which the district considered the amended rulethe district announced two significant exceptions. One exempted essential public services from certain interim limits. The other allowed small manufacturers to average their emissions. (See ibid.)
Those last-minute exceptions contravened section 40725, requiring 30 days' public notice of a new rule. As we explained, the timing of the exceptions served to "`sandbag'" the opposition to the amended rule in three ways: They effectively bought off opposition to the rule from public agencies like CalTrans (California's Department of Transportation) and Metropolitan Water District (both of which have a need for coatings relatively high in volatile organic compounds because they last longer); they made it more difficult for opponents of the limits to rally opposition; and, they even precluded opponents of any exemptions from being heard. (National Paint Association I, supra, G029462.) We directed a writ of mandate to command the district to vacate its 1999 amendments, so as to allow the amended rule the required time to circulate before adoption. (Ibid.)
In our unpublished opinion, we stated that we did not reach the "merits" of the paint association's challenge to the 1999 rule. We did observe in that regard, though, that, for certain heavy-duty public uses such as electrical transformers and water pipelines, "there is a serious question as to whether there are now any low volatile organic paints available as substitutes." (National Paint Association I, supra, G029462.)[5]

*1502 B. National Paint Association II

By the end of December 2002, that is, within less than seven months of the filing date of National Paint Association I, the district promulgated an amended rule, this time avoiding the procedural mistake of inserting exemptions at the last minute. QuicklyJanuary 2003the paint association filed suit in Orange County Superior Court, again asserting that the amended rule (let's call this the 2002 rule) violated the district's enabling statutes.
Not to put too fine a point on it, the district's lawyers quickly outmaneuvered the paint association's lawyers into what was no doubt perceived to be a more favorable forum for their side. They had the case removed to federal court.[6]
The details here are interesting: The district's notice of removal was based on the theory that there had been a consent judgment in an unrelated federal case going back to 1997 which gave the district a "colorable federal defense" to the paint association's lawsuit.[7] After the notice of removal to federal court, the paint association responded with a motion to remand back to state court. Federal trial court judges typically have enough federal work to do without having to unnecessarily kibitz matters of state law, and, in 2004, the federal court granted the paint association's motion to send the case back to state court.
But the district appealed that order, and, if one reads the ensuing unpublished Ninth Circuit opinion, one finds that the federal judge's remand order was reversed because the paint association's counsel filed its remand request too late.[8]
In short, but for a procedural mishap by the paint association's counsel, the case would have gone back to state trial back in 2004, and then on to *1503 (presumably) this appellate court by 2005 or maybe 2006. Instead, the Ninth Circuit did not issue its decision reversing the remand order until summer 2006, requiring Federal District Court Judge Dean Pregerson to undertake the arduous task of deciding the merits of the paint association's challenge.
The task was accomplished in May 2007, resulting in a published decision, National Paint & Coatings Association v. South Coast Air Quality Management District (C.D.Cal. 2007) 485 F.Supp.2d 1153, or "National Paint Association II." Significantly, the decision was decided as a matter of the federal court's diversity jurisdiction, looking solely to California precedent and statutes to best ascertain how our state's highest court would rule. (See id. at pp. 1155-1156.) When one reads the decision one discovers that, despite the supposedly federal basis for the original remand request, there is no federal law component in the National Paint Association II opinion. (So much for that "colorable federal defense.")
The federal trial court decided to deny the paint association's requested writ in National Paint Association II. We will discussand mostly agree withthe federal trial court's decision National Paint Association II below in parts III.D. and III.E.1. of this opinion. (Our sole disagreement is with National Paint Association II's decision not to consider one of the statutes in the scheme.) It should be noted here, though, that the point on which we agree with the paint association concerning the two categories of paints and coatings for which there is no evidence of availability or achievability was itself not specifically addressed in National Paint Association II.

C. National Paint Association III

However, the paint association's lawyers hadn't been completely outmaneuvered. During the case's sojourn in the federal courts, the state case continued in fits and starts. (Remember that the federal trial court had decided the case should be sent back to state court by early 2004, so, from the state trial court's point of view, for the period 2004 through 2006, it had in front of it a case where remand to federal court had been rejected.)
The state court was going to try the paint association's suit in three phases: (1) the legal authority of the district to propound the 2002 rule; (2) other claims by the paint association (e.g., that the district had not engaged in an adequate socioeconomic impact assessment); and (3) the district's own affirmative defenses. Phase 1, dealing with the issue of the district's authority, was tried to the court in September 2004. After that, however, there appears to have been a hiatus in the state court of about a year, until April 2006, when the district proposed a statement of decision. The paint association objected to that proposed statement in June 2006. In July 2006, before the trial court *1504 decided the matter, the Ninth Circuit reversed the federal court's decision to reject the remand to federal court. In the period August 2006 through May 2007, National Paint Association II was being litigated in the federal trial court. After the May 2007 decision by the federal trial court, the paint association dismissed its claims not associated within the scope of the district's authority, that is, not otherwise covered by phase 1. The dismissals left no causes of action in the state case for judgment, and finally, in January 2008, the trial court issued its statement of decision as to phase 1 proposed back in April 2006.[9]
The statement of decision noted the evidence in the administrative record that a number of compliant paints and coatings were present on the market, and further referenced a 1997 assessment by Eastern Michigan University on the state of technology for low volatile organic compound coatings. The assessment concluded that low volatile organic compound technology "`should witness major progress over the next 5 to 7 years.'" The assessment further "concluded that by the year 2005, there will be near-zero [volatile organic compound] coatings commercially available in a number of categories" (which, of course, also suggests that they would not be available in at least some others).
The statement of decision also pointed to four "`escape routes'" that "address" the paint association's "feasibility concerns." One was the averaging provision (discussed above). The second was an extension of compliance deadlines for small "niche" paint manufacturers "that may be unable to utilize averaging." The third were requirements that the district's staff "conduct technology assessments to evaluate industry's progress in meeting" the limits and report back to the board as to the "`appropriateness of maintaining'" future volatile organic compound limits. Finally, the statement of decision pointed to the statutory product variance process as set out in section 42365 et seq.
With the statement of decision, a judgment ensued denying the paint association's petition. A timely notice of appeal followed.

*1505 III. DISCUSSION

A. Collateral Estoppel: Public Interest Exception

(1) The paint association's appeal is not foreclosed by the federal trial court's decision in National Paint Association II. The reason is the public interest exception to the doctrine of collateral estoppel. (See Kopp v. Fair Pol. Practices Com. (1995) 11 Cal.4th 607, 620-621 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (Kopp) [refusing to apply public interest exception to collateral estoppel and res judicata doctrines where Ninth Circuit had upheld federal trial court decision declaring parts of California campaign finance reform initiative unconstitutional]; City of Sacramento v. State of California (1990) 50 Cal.3d 51, 64 [266 Cal.Rptr. 139, 785 P.2d 522] [prior decision adversely affected taxpayers or, alternatively, affected receipt of federal funds; either way, public interest required definitive decision]; Greenfield v. Mather (1948) 32 Cal.2d 23, 35 [194 P.2d 1] [recognizing public interest exception to res judicata]; Modesto City Schools v. Education Audits Appeal Panel (2004) 123 Cal.App.4th 1365, 1379 [20 Cal.Rptr.3d 831] ["courts recognize an exception to the rule of collateral estoppel where there is a prior ruling on a question of law and the issue concerns a matter of public interest"].)
As the California Supreme Court pointed out in Kopp, state courts are the "`principal expositors of state law'" (Kopp, supra, 11 Cal.4th at p. 620, quoting Moore v. Sims (1979) 442 U.S. 415, 429 [60 L.Ed.2d 994, 99 S.Ct. 2371]) and "federal courts `lack jurisdiction authoritatively to construe state legislation'" (Kopp, supra, 11 Cal.4th at p. 620, quoting United States v. Thirty-Seven Photographs (1971) 402 U.S. 363, 369 [28 L.Ed.2d 82, 291 S.Ct. 1400]).
The need for authoritative state construction of state legislation is illustrated in Arcadia Unified School Dist. v. State Dept. of Education (1992) 2 Cal.4th 251 [5 Cal.Rptr.2d 545, 825 P.2d 438] (Arcadia). There, a prior state appellate decision was unpublished and thus could not be cited as legal authority. (Id. at p. 257.) Because of the void, our high court thus applied the public interest exception.
Arcadia is a template for the case before us. As otherwise persuasive or helpful as it might be, National Paint Association II is not binding on any California trial court. And of course the matter is of significant public interest. Everyone breathes. And everyone has some contact with paint or coating, even if only to rely on electric transformers and water lines that need rust proofing.
Ironically, the need for an authoritative state court interpretation of the district's "best available technology" statutes was itself underscored by the *1506 federal trial court in National Paint Association II. Judge Pregerson made a point of noting that "The California Courts have thus far declined to rule on the scope of [the district's] rule-making authority." (National Paint Association II, supra, 485 F.Supp.2d at p. 1157.)
This case also seems particularly appropriate for application of the public interest exception given that the removal to federal court was based on federal issues, yet federal issues did not play any role in the federal trial court's decision in National Paint Association II. In point of fact, the only reason the federal court was burdened with the job of interpreting state law in the first place was a procedural mishap (the lack of a timely filing) by the paint association.

B. Standard of Review

A word on the standard of review. The subject has already been well covered in Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (Yamaha), in both the majority and concurring opinions. As the Yamaha majority explained, when dealing with controlling statutes: "In one respect, our opinion in Wallace Berrie [& Co. v. State Bd. of Equalization (1985) 40 Cal.3d 60 [219 Cal.Rptr. 142, 707 P.2d 204]] may overstate the level of deferenceeven quasi-legislative rules are reviewed independently for consistency with controlling law. A court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature. The court, not the agency, has `final responsibility for the interpretation of the law' under which the regulation was issued." (Yamaha, supra, 19 Cal.4th at p. 11, fn. 4, italics added.) Even so, the court still accords "`great weight and respect to the administrative construction.'" (Id. at p. 12.)
And, as Justice Mosk wrote, concurring in Yamaha: "In the case of quasi-legislative regulations, the court has essentially two tasks. The first duty is `to determine whether the [agency] exercised [its] quasi-legislative authority within the bounds of the statutory mandate.' ... [T]his is a matter for the independent judgment of the court." (Yamaha, supra, 19 Cal.4th at p. 16 (conc. opn. of Mosk, J.), italics added, citation omitted.)
As we read these rules, it is an independent question of law for this court whether the 2002 amendments exceeded the district's statutory authority. As Justice Mosk wrote for a unanimous court in Association for Retarded *1507 Citizens v. Department of Developmental Services (1985) 38 Cal.3d 384, 390-391 [11 Cal.Rptr. 758, 696 P.2d 150]: "The scope of judicial review of quasi-legislative administrative action is well settled. ... To be valid, such administrative action must be within the scope of authority conferred by the enabling statute. ... We have long recognized, of course, that `the construction of a statute by officials charged with its administration, including their interpretation of the authority invested in them to implement and carry out its provisions, is entitled to great weight....'... Nevertheless, `[w]hatever the force of administrative construction, ... final responsibility for the interpretation of the law rests with the courts.'" (Italics added, fn. & citations omitted.)

C. The Controlling Statutes

1. Overview and Relevant Statutory Text
(2) In California, the regulatory agency with authority over vehicular air pollution is the California Air Resources Board. A series of regional regulatory districts have authority over nonvehicular air pollution. (§ 40000 ["The Legislature finds and declares that local and regional authorities have the primary responsibility for control of air pollution from all sources, other than emissions from motor vehicles. The control of emissions from motor vehicles, except as otherwise provided in this division, shall be the responsibility of the state board."].) The most prominent of these regional districts, given Southern California's well-known smog problem, is of course the South Coast Air Quality Management District. (See § 40402.)[10]
*1508 The district's rule-making authority is delineated in section 40440. While we quote the entirety of the statute in the margin,[11] the critical text is in subdivisions (a) and (b), which we quote here:
"(a) The south coast district board shall adopt rules and regulations that carry out the plan and are not in conflict with state law and federal laws and *1509 rules and regulations. Upon adoption and approval of subsequent revisions of the plan, these rules and regulations shall be amended, if necessary, to conform to the plan.
"(b) The rules and regulations adopted pursuant to subdivision (a) shall do all of the following:
"(1) Require the use of best available control technology for new and modified sources and the use of best available retrofit control technology for existing sources."
The phrases "best available control technology" and "best available retrofit control technology" have been specifically defined in sections 40405 and 40406 (the definitions part of the statutory scheme setting up the district) respectively. Section 40405 provides in its entirety:
"(a) As used in this chapter, `best available control technology' means an emission limitation that will achieve the lowest achievable emission rate for the source to which it is applied. Subject to subdivision (b), `lowest achievable emission rate,' as used in this section, means the more stringent of the following:
"(1) The most stringent emission limitation that is contained in the state implementation plan for the particular class or category of source, unless the owner or operator of the source demonstrates that the limitation is not achievable.
"(2) The most stringent emission limitation that is achieved in practice by that class or category or source.
"(b) `Lowest achievable emission rate' shall not be construed to authorize the permitting of a proposed new source or a modified source that will emit any pollutant in excess of the amount allowable under the applicable new source standards of performance."
Section 40406 provides in its entirety: "As used in this chapter, `best available retrofit control technology' means an emission limitation that is based on the maximum degree of reduction achievable, taking into account environmental, energy, and economic impacts by each class or category of source."

*1510 2. California Cases on the Controlling Statutes
While a number of California appellate decisions have involved challenges to air pollution regulations promulgated by the district,[12] as we have noted above, the federal trial court in National Paint Association II stated California courts had "thus far declined" to "rule on the scope of [the district's] rule-making authority." (National Paint Association II, supra, 485 F.Supp.2d at p. 1157.)
The federal trial court's statement, however, was not quite accurate. Two published appellate decisions have certainly dealt with the scope of the district's authority in the context of pondering just what the Legislature intended when it wrote the words, "best available" in the context of new or retrofit technology.
(3) First, in upholding district regulations limiting the amount of small particulate matter that refineries may emit, the Western States case dealt with the problem of exactly what is meant by the word "achievable." (See Western States, supra, 136 Cal.App.4th at p. 1019.)[13] The Western States court took the commonsense view that if something had already been done, it's achievable, and on that basis reasoned that if one out of six refineries had been able to meet the district's small particulate matter standard, that standard was *1511 achievable by the five others. (See 136 Cal.App.4th at pp. 1019-1020 [rejecting notion that a given refinery's "achievements" were not a "fair indication" that the other refineries could also meet the standard].)
Second, Security Environmental, supra, 229 Cal.App.3d 110, had occasion to comment on the meaning of "best available control technology" in the context of permits for a hazardous waste incineration facility based on what had been a negative declaration as to environmental effects. In that case, the district wanted to condition construction of the incineration facility on its using the "best available control technology" at the time of construction, even though permits had already been granted more than two years previously. The Security Environmental court observed: "The [best available control technology] has progressed since the original permits and new information is available in the form of technology for controlling acid gases, particulates and their associated dioxins and furans. It has further been determined that a previously known [selective catalytic reduction nitrogen oxide] control system is cost effective now due to new information, thus qualifying its use on hazardous waste incinerators as technologically feasible [best available control technology]. [¶] Thus the new information raising the possibility of substantially increased health risk and the availability of new emission control technology which may lessen that risk require an [environmental impact report] to set forth the present significant environmental effects of the proposed project and any mitigating measures to minimize the significant environmental effects and alternatives to the proposed project." (Security Environmental, supra, 229 Cal.App.3d at pp. 124-125, italics added.)
(4) The passage is significant. Like the Western States court, the Security Environmental court treated the phrase "best available control technology" in the common, ordinary sense of the words "best" and "available" as something that existsrather than something that might one day be expected to exist.

D. Source Versus Application

The core of the paint association's challenge to the 2002 rule may be summarized this way: While compliant paints and coatings may exist in various categories, there is no evidence in the administrative record that those compliant paints and coatings are suitable for all "applications" or uses of those paints. Thus, for example, there is nothing to show that any of the paints or coatings used for, say, heavy-duty hard-weather "applications" like electric transformers or street lights, are suitable for such a use.
(5) On this point, the district has the better part of the argument. The key word in the statute is sourcesas in "sources" of pollutionnot "applications." The cornerstone statute, section 40000, is framed in terms of the *1512 district's responsibility for "control of air pollution from all sources" (italics added) while the more detailed subdivision (b)(1) of section 40440 is similarly framed in terms of sources of pollution: "Require the use of best available control technology for new and modified sources and the use of best available retrofit control technology for existing sources." (Italics added.)
As the federal trial court (we think correctly) divined in National Paint Association II, the number of possible "applications" is infinite. (National Paint Association II, supra, 485 F.Supp.2d at p. 1158 [reference to "`every conceivable application'"].)
Put another way: You can slap paint on anything. It is therefore unreasonable to believe that the Legislature intended to think of the object receiving the paint or coating as a regulated "source of pollution"; the natural reading of the word is that the paint or coating itself is the regulated "source," particularly when one realizes that it is paint or coating that is the "source" of any obnoxious fumes from an object that might escape into the air. It follows then that if the district's rule directed at the paint or coatingas distinct from whatever the paint or coating is put onis within the authority of the statute, that is enough to comply with the statute. Any other conclusion would mean that no paint or coating could ever be limited in emissions, because one could always dream up a heavy-duty application for which the limit would be, as the doctors say, counterindicated.

E. State of the Art

1. The Analysis So Far
Based on what we have noted so far, we uphold the 2002 rule as it applies to all but two categories of regulated paints and coatings. The administrative record contains a table of "currently available compliant coatings" that shows that there are at least some compliant coatings (compliant with the 2006 limits) in all categories except, as we have noted, quick-dry enamels and rust preventative coatings.
To be sure, in some categories the total percentages of coatings compliant with the 2006 limits are pretty low: Only 8 percent of quick-dry primer sealer undercoaters are shown compliant with the 2006 limits, only 11 percent of industrial maintenance coatings are compliant, and only 3 percent of nonflat coatings are compliant.
Even so, in the ordinary sense of the words, it means that there are "best available" paints and coatings, in existence, that meet the 2002 rule. Obviously such coatings are "achievable"they have been, in fact, achieved. *1513 Applying the Western States rationaleif it has already been done, it's achievableit is clear that the rule is within the bounds of section 40440 as regards these categories.

2. Beyond State of the Art: "Strawless Bricks" Versus "Godot"
We now turn to the issue as to whether the limits on two categories, quick-dry enamels and rust preventative coatingscategories for which there are no known compliant coatings in existence (at least in this record), are within the scope of the district's statutory authority.
The parties proffer two different models of the statute, basically dividing on whether the district's statutory authority is limited to requiring state-of-the-art technology, or extends to requiring technology that is beyond current state of the art.
Which brings us to a topic that is generally referred to in the literature as "technology forcing." Unfortunately, the phrase "technology forcing" is not always clear. At its mildest, it appears to connote technology redirection, in which the law seeks to "shape" technology into existent low or zero emission approaches, even if, for example, those approaches are relatively expensive. At its most extreme, technology forcing connotes an attempt to decree a technological result by legal ukase.
Two competing literary tropes exemplify "technology forcing" in this extreme sense. On the positive side, we have the comment of the federal appellate court for the District of Columbia in a 1980 occupational safety case, suggesting that if the legislative goal is sufficiently important, that fact overrides what does, or does not, exist as state of the art. The goal, as the court said, simply cannot wait for "the Godot of scientific certainty." (United Steelworkers of America, AFL-CIO-CLC v. Marshall (D.C. Cir. 1980) 208 U.S. App.D.C. 60 [647 F.2d 1189, 1266] (United Steelworkers).)
Godot was the subject of Samuel Beckett's absurdist play about two characters waiting for a compatriot whoand here's the punch linenever arrives.[14] (Perhaps a more popular trope for the technology forcing approach would be Captain Picard's line to his immediate subordinate in the second Star Trek series, "Make it so, Number One!") In the "Godot" model, the regulatory agency need only show that "modern technology has at least conceived some industrial strategies or devices" that will be "likely to be *1514 capable of meeting" the regulatory requirement. (United Steelworkers, supra, 647 F.2d at p. 1266, italics added.)
The other literary trope is of somewhat older origin than Beckett's play. It is Pharaoh's venting of his displeasure with the Israelite slaves by making them gather their own straw to make bricks, yet maintaining the same quota for brick production. Needless to say, that was a bit of a hardship.[15] It was not "feasible" to make bricks without straw, or at least, given the technology of the day, decent bricks of the sort that a ruler like Pharaoh would require for some building project like his tomb.[16] In the "brickless straw" model, the limits of the agency's authority do not extend beyond what currently exists.

3. When All Else Fails Read the Relevant Statutes
These competing images, however, can only serve as images of competing legislative models, they cannot tell what our Legislature actually intended. To do that, we must actually examine the words of the relevant statutes.

a. Plain Meaning

We now parse the relevant statutes, sections 40405, 40406, and 40440.
(6) The operative grant of rule-making authority to the district is found in section 40440, subdivision (b)(1) where the district is mandated to adopt rules that "Require the use of best available control technology for new and modified sources and the use of best available retrofit control technology for *1515 existing sources." Beyond that sections 40405 and 40406 define "best available control technology" and "best available retrofit control technology" respectively in terms of an "emission limitation" that "will achieve the lowest achievable emission rate for the source to which it is applied" (§ 40405, subd. (a)) or "an emission limitation that is based on the maximum degree of reduction achievable" (§ 40406).
We first notice the obviousthe first operative word in the operative phrase: "best." Best is a comparison word: good, better, best, and thus implies a choice of things existing. Competing speculative technologies or what is merely "conceivable" do not lend themselves to easy comparison.
We next notice the word "available." The word similarly indicates something that exists in a way that things that are merely "conceivable" do not. Cold fusion is conceivable. It is not, today, available.
What about "achievable"? The word "achievable" has the distinction of having one of the shortest definitions one is likely to encounter in the Oxford English Dictionary. It is literally one phrase: "Capable of being achieved." And the definition of "achieved" is similarly short, consisting of four synonyms, all in the past tense: "Completed, accomplished; attained, won." (1 Oxford English Dict. (2d ed. 1989) p. 102.)
(7) The past tense in the variations on the word "achievable" indicate that it refers to a thing or process that currently exists, as distinct from what is speculative or merely theoretical. When construed together with the words "best" and "available," the conclusion becomes inevitable: The district has authority to require the best of what exists, not what might conceivably come on the market.
What about the "able" in achievable? Surely the choice of the word "achievable" as distinct from "achieved" is some indication that the district may require at least something, even if it doesn't exist as such, that can be readily put together.
Indeed, we agree. It is said, for example, while some nations do not possess atomic weapons as such, they can put them together on a moment's notice. The technology for them already existsit is simply a matter of the will to assemble the component parts.
So, the fact that there are no existing compliant coatings at, say "time one," does not necessarily mean such coatings could not be "achieved" at, say, "time one plus almost immediately thereafter." That is, even if something does not currently exist, it is "achievable" in the sense that it can be readily *1516 assembled out of things that currently do exist. Using lemon juice instead of pesticides in your kitchen to kill ants is certainly achievable, even if you don't have any lemon juice on hand.
This opinion should therefore not be read as restricting the district's authority to promulgate a rule requiring what is "achievable" when based on existing technology.
Thus, the fact that there are no compliant quick-dry enamels or rust preventers that are compliant with the 2006 limits is not absolutely dispositive. However, as shown by the trial court's own statement of decision referencing the Eastern Michigan University assessment of the state of technology for low volatile organic compound coatings, there was no evidence of any ready-to-be-assembled sort of achievability. That assessment simply prophesied that there would be "`major progress over the next 5 to 7 years'" and predicted, H.G. Wells style, that there would be compliant coatings by the year 2005.
Science fiction is not substantial evidence. A trend line does not achievability make. There is the logical fallacy of extrapolation, which assumes that the future will be like the past, only more so. (See Rahdert, Of Impressionists and Rohrschach Blots (1986) 86 Colum. L.Rev. 1283, 1288, fn. 13 ["Indeed, Professor Friedman warns us early on not to indulge in the `extrapolation fallacy'the usually erroneous assumption that the future will be just like the present, only more so ..."[17]].) It is a fallacy which, in other contexts, California courts have squarely rejected. (E.g., In re Marriage of Mosley (2008) 165 Cal.App.4th 1375, 1386 [2 Cal.Rptr.3d 497] ["We must be wary of `the logical fallacy of extrapolation, in which some series of events in the past is necessarily assumed to continue in exactly the same way into the future.'"].)
There is thus a difference between existing technology and projected technology based on a trend line. Some of us are old enough to remember those bumptious predictions in the 1950's forecasting that we'd all be commuting to work in flying aerocars. And wasn't there a 1967 Star Trek episode that was premised on the exile of a tyrant who, in 1996, blasted off into deep space? The extrapolation of the space technology of 1967 into an interplanetary voyage in 1996 didn't seem quite so laughable at the time. The point is: The Legislature used the words "best," "available" and "achievable," and those words demand something currently existing, not mere projection.

*1517 b. Light Shed by Statutes Part of the Same Scheme

Any doubt about our conclusion is dispelled by examining the statutory scheme of which sections 40405, 40406, and 40440 are a part.
The district's authority is part of a general legislative scheme to control air pollution from nonvehicular sources in Southern California, and this scheme envisions controls on both existing and new sources. (See § 40440, subd. (b)(1) [reference to "new and modified sources" and "existing sources"].)
(8) Statutes which are part of the same scheme should be construed together. (Copley Press, Inc. v. Superior Court (2006) 39 Cal.4th 1272, 1289-1290 [8 Cal.Rptr.3d 183, 141 P.3d 288] [giving term "employing agency" consistent meaning across statute]; County of Placer v. Aetna Cas. etc. Co. (1958) 50 Cal.2d 182, 188-189 [23 P.2d 753] ["statutes relating to the same subject matter are to be construed together and harmonized if possible ..."]; Wertin v. Franchise Tax Bd. (1998) 68 Cal.App.4th 961, 974 [80 Cal.Rptr.2d 644] ["Statutes are to be construed together with other statutes forming part of the same scheme."].)
The point is important for the case before us because the Legislature in this case used exactly the same phrase"best available"to describe what it wanted the district to do for both new and existing (and only existing sources can be in need of retrofitting) "sources" of pollution.
We may thus learn things about "best available retrofit control technology" for existing sources of pollution from what the Legislature said about "best available control technology" for new sources.
And what we learn is: Best available means best available, not what is "conceivable."
First, section 40723, subdivision (b), which by its terms involves "best available control" technology as distinct from "best available retrofit control" technology, says that operators of equipment subject to "best available control technology" requirements have the right to request the district to "review whether the applicable requirements have been achieved and whether the requirements should be required for the source category." (Italics added.)[18]
*1518 It would be highly anomalous for the Legislature to build in a protection for the operators of equipment subject to rules governing new sources of pollution, namely that the operator could request review as to whether the requirements had been "achieved"past tenseif the Legislature intended that rules governing existing sources of pollution could be based on technology beyond state of the art. If anything, one would expect the reverse: If the Legislature wanted to give the district authority to make rules requiring something beyond state-of-the-art technology, it would presumably want to give that authority first as regards any new sources of pollution, where, after all, the most recent "conceivable" technologies would be more likely to be devised, then attempted.[19]
*1519 Second, section 40703 similarly points in the direction of existing, as distinct from conceivable, technology. The statute provides in full that: "In adopting any regulation, the district shall consider, pursuant to Section 40922, and make available to the public, its findings related to the cost effectiveness of a control measure, as well as the basis for the findings and the considerations involved. A district shall make reasonable efforts, to the extent feasible within existing budget constraints, to make specific reference to the direct costs expected to be incurred by regulated parties, including businesses and individuals." (Italics added.) Cost-effectiveness is a factor which necessarily demands the hard data ("direct costs") associated with existing technology. Conceivable technology that is only "likely" to meet a regulatory requirement given a hypothesized trend line is generally not amenable to clear-eyed cost accounting.
Third, section 40922 similarly follows section 40703 in mandating consideration of cost-effectiveness, again suggesting that whatever "best available" technology that the agency may be considering requiring actually be available, and therefore amenable to cost calculation.[20]
Next, section 40916, though it ostensibly governs the powers of the state air resources board, addresses the problem of volatile organic compounds in paints in terms of state of the art, implying a regulatory regime aimed at the possible, not merely the conceivable. Subdivision (d) of the statute provides power to the state air resources board to "recommend a suggested control measure for adoption by a district to meet the requirements of the district's plan adopted pursuant to this chapter for any architectural paint or coating, if the state board determines all of the following: [¶] (A) The control measure will achieve a feasible reduction in volatile organic compounds emitted by the architectural paint or coating. For purposes of this paragraph, `feasible reduction in volatile organic compounds emitted' means an emission limitation that is achievable, taking into account environmental, energy, and economic impacts. [¶] (B) Adequate data exist to establish that the control measure is necessary to attain state and federal ambient air quality standards. [¶] (C) The control measure is commercially and technologically *1520 feasible and necessary." (Italics added.)[21] It is hard to have "adequate data" and gauge "environmental, energy, and economic impacts" when technology is still on the drawing board.
Finally, section 40440.11, which governs the situation where the district proposes best available control technology that is stricter than federal law requires, restricts the district's options to equipment that is "existing in that source category or a similar source category." Again, it would be highly anomalous for the Legislature to give the district authority to, in effect, order technology by decree in one statute, when it was confining the district's options to "equipment existing in that source category" (italics added) in another statute.[22]

*1521 4. The Escape Valves
An important part of the rationale of National Paint Association II, Western States, and the statement of decision by the trial judge here is the existence of escape valves. The main escape valves are (1) averaging, and (2) the possibility of individual variances under section 42365. The latter is a one-sentence statute that provides for individual relief: "Any person who manufactures a product may petition the hearing board for a product variance from a rule or regulation of the district pursuant to this article." (The other ones are extra time and the right to request a technology review.)
Because we have concluded that the district has authority to require state-of-the-art technology (here, in paints and coatings), and because in most of the regulated categories compliant coatings existmeaning that the district's rule certainly does not exceed the state of the art as to those categories, we do not ground our upholding of the district's rule on the fact of these escape valves.
The significance of our refusal to ground the upholding of the rule on escape valves is that we must reject the paint association's argument about *1522 the hardship the rule has on small niche manufacturers. According to the paint association, the fact of escape valves does nothing to help such manufacturers, because they lack the proprietary technology to duplicate the compliant coatings (to say nothing of their inability to duplicate such coatings economically), and their market is too small to take advantage of averaging.
(9) The hardship to small manufacturers, however, does not show that the 2002 rule exceeded the scope of the district's statutory authority. The district's scope of authority is framed in terms of limiting pollution by source, not manufacturer. Averaging is simply a way for a given manufacturer to produce some noncompliant coatings and still remain in business.[23] Variances, by contrast, do not go to the scope of the authority to make a rule, they go to whether that rule should be applied in a given instance. The upshot is: If niche manufacturers cannot take advantage of averaging, they must seek variances. The district's rule is still within its authority.
By the same token, however, the existence of the possibility of averaging or of a variance cannot create statutory authority that the Legislature never gave the district in the first place. Sections 40440, 40405, and 40406 do not say to the district: "Never mind if you require emission limits that are beyond state of the art and therefore outside of your authority to make a rule; feel free to do that because the possibility of averaging, or variances (or extra time or a staff technology review), allows you to command anything you want." No. The statutes are framed as a grant of authority, and there is an independent possibility for variances if the proper exercise of that authority is too onerous as regards a given manufacturer. Put another way: The possibility of a legitimate exception to a rule that strays beyond an agency's authority does not place the rule within that authority in the first place.

5. Floors Versus Ceilings
From what we have just seen in the statutory language, the Legislature evidently did not contemplate regional air pollution rules that required technology beyond state of the art. The district counters with the assertion that these "best available technology" statutes do not, as a matter of fact, limit *1523 the district's authority to make rules, they simply require the district to make rules that require at least state of the art, but the district still has authority to make rules that go beyond state of the art.
There are two answers to this point. First, there is nothing in the text or legislative history[24] of the statutes that sets up any sort of dichotomy on the lines of: "Make rules requiring the best technology available, and feel free to also make rules requiring technology that is not available as well." That is, there is a paucity of statutory language for the idea that "best available technology" is merely a "floor," not a "ceiling."
(10) Second, the statutory grant of authority to the district is one that specifically requires the district to remain within the bounds of the established statutes. Section 40440, subdivision (a) provides that "The south coast district board shall adopt rules and regulations that carry out the plan and are not in conflict with state law and federal laws and rules and regulations." (Italics added.) Section 40916, subdivision (d)(1)(C)(2) provides: "Every rule adopted by a district regarding architectural paint or coatings shall be adopted by the governing board of the district in accordance with existing law, and shall include at least one public workshop." (Italics added.) Under the district's asserted scope of its authority, the words "best available" as used in sections 40440, 40405, and 40406 would be surplusage, with the Legislature having said, in effect: "You are to require the best available technology to reduce emissions, but don't worry about figuring out what the best available technology is, because you can always go beyond that."

IV. CONCLUSION
The judgment denying the requested writ of mandate sought by the paint association is affirmed, except in the following respects:
*1524 As to, and only as to, quick-dry enamels and rust preventative categories of coatings, the matter is remanded to the trial court for a hearing to determine whether there is any current (2009) state-of-the-art technology available to comply with the district's 2006 limits on volatile organic compounds. If the trial court determines that there is not, the trial court shall grant the relief requested by the paint association as to those two categories of coatings only. If there is, the trial court shall deny the relief requested.
In the interest of justice each side shall bear its own costs on appeal.
Bedsworth, J., and Moore, J., concurred.
NOTES
[1] It is possible to write an opinion in the area of air pollution control law without descending into an alphabet soup of jargon-based acronyms familiar only to practitioners who live and, er, breathe this area of the law. (E.g., Sierra Club. v. U.S. E.P.A. (7th Cir. 2007) 499 F.3d 653 (opn. by Posner, J).) This point is of some substantive importance because the use of acronyms tends to obscure, certainly in the reader's mind and sometimes even in the writer's, the underlying reality of a case, and the legal issues on which it must turn. For example, the case before us essentially revolves around two words widely used in federal and state air pollution control statutes, "available," and "achievable." But when the words are incorporated into the widely used acronyms "BACT"for "best available control technology" or "BARCT"for "best available retrofit control technology"their full significance is obscured. "BACT" and "BARCT" take on a life of their own, severed from the actual statutory language.

Besides which, the literature in this area tends to be more difficult to read (at least for a nonspecialist) because of the heavy use of acronyms. Consider, for example, this sentence, committed on page 32 of the appellant's opening brief: "In June 22, 2000, CARB adopted an SCM for AIM coatings." Huh? Even if one can figure out that "CARB" means "California Air Resources Board" and "AIM" means "architectural and industrial maintenance coatings," one scurries around the brief looking for the first use of "SCM," which, one finds from a passage about 11 pages before, means "suggested control measure." (Well, the use of acronyms is at least one way to force judges to reread passages from the brief.) It is all needlessly confusing. (See Scalia & Garner, Making Your Case: The Art of Persuading Judges (2008) p. 120 ["Acronyms are mainly for the convenience of the writer or speaker. Don't burden your reader or listener with many of them, especially unfamiliar ones."].)
We will therefore, in this opinion, in order to maintain a modicum of readability and register our small protest against the further uglification of the English language, avoid the further use of acronyms in this opinion.
Except for this footnote. It is also apparent that many specialists in this area are addicted to acronyms, and, more importantly, when researching computerized databases, are more likely to plug in "BACT" or "CARB" than their English equivalents, and may not find this case unless it contains those acronyms. (Cf. Seibert Security Services, Inc. v. Superior Court (1993) 18 Cal.App.4th 394, 404-405, fn. 3 [22 Cal.Rptr.2d 514] [choosing to use nongender-neutral term "fireman's rule" in part because it is "more readily accessible to electronic researchers not enlightened enough to program `firefighter's rule' into their search requests"].) We therefore now provide a list of common acronyms for this case and area of the law, so at least such researchers will be able to find this footnote:
NPCANational Paint & Coatings Association, the plaintiff in this case, which we will call "the paint association."
SCAQMDSouth Coast Air Quality Management District, a regional regulatory agency and the defendant in this case, which we will call "the district."
VOCvolatile organic compounds, generally used to make paint and other "coatings" last and adhere to surfaces, and which also make paint stink and pollute the air (by helping form smog). Volatile organic compounds are what this case is all about.
CAAClean Air Act (42 U.S.C. § 7401 et seq.), federal clean air legislation going back to the Kennedy administration.
CCAACalifornia Clean Air Act, enacted to bring California law into conformity with the federal Clean Air Act. (See Health & Saf. Code, § 39500 et seq.)
AIMarchitectural and industrial maintenance coatings. While "coatings" has the industry-promulgated euphemistic feel as a fancy word for paint, we will use "coatings" where appropriate instead of paint because it is more accurate. Something you put on something else to prevent it from rusting, or to protect it from the weather as distinct from making it look nicer, is, substantively, a "coating" as distinct from mere "paint."
SCMsuggested control measure.
Rule 1113the district's basic rule governing the amount of volatile organic compounds in paint and coatings, which we will call "the rule." Technically it is an amended rule, having first been enacted in 1977.
[2] For example, if we read the table of standards for grams per liter, minus water and exempt compounds, the limit for "quick-dry enamels" (eff. July 2007) is 50 grams per liter, the level for clear wood finishes (eff. July 2006) is 275 grams per liter, and the level for roof coatings (eff. Jan. 2003) is 250 grams per liter. Amateur and professional artists, on the other hand, may (or may not) be relieved to learn that the limit on graphic arts coatings has remained at the relatively high level of 500 grams per liter since at least 1998.
[3] All further undesignated statutory references in this opinion are to the Health and Safety Code.
[4] For reader convenience, we now provide an outline of this opinion:

I. INTRODUCTION
II. THE HISTORY OF THE LITIGATION
A. National Paint Association I
B. National Paint Association II
C. National Paint Association III
III. DISCUSSION
A. Collateral Estoppel: Public Interest Exception
B. Standard of Review
C. The Controlling Statutes
1. Overview and Relevant Statutory Text
2. California Cases on the Controlling Statutes
D. Source Versus Application
E. State of the Art
1. The Analysis So Far
2. Beyond State of the Art: "Strawless Bricks" Versus "Godot"
3. When All Else Fails Read the Relevant Statutes
a. Plain Meaning
b. Light Shed by Statutes Part of the Same Scheme
4. The Escape Valves
5. Floors Versus Ceilings
IV. CONCLUSION
[5] The opinion also avoided acronyms. Judging by the briefing in the case before us now, nobody got the hint. Unfortunately, there are no rehab clinics for acronym addicts.
[6] While the district makes a collateral estoppel argument based on the federal district court's ensuing decision, its brief, otherwise a splendid document except for its reliance on acronyms, is very sparing with the procedural details of how the district court got the case in the first place and how it came to issue its decision. Actually it pretty much avoids the issue altogether. This is a rather telling omission.

While the proper term for a federal trial level court is "federal district court," to avoid confusion with the agency we refer to as the "district," we will refer to that court as either "the federal court" or "the federal trial court."
[7] The case was Coalition for Clean Air v. South Coast Air Quality Management District, California Central District No. CV97-6916-HLH (SHx).
[8] See National Paint & Coatings Association v. South Coast Air Quality Management District (9th Cir. 2006) 195 Fed.Appx. 557: "Accordingly, the district court in the present case erred in remanding the case to state court because [the paint association] failed to move to remand the case within the 30-day time limit of [28 U.S.C.] § 1447(c)."
[9] The district's adopted statement of decision recites that the trial judge carefully reviewed the "voluminous Administrative Record." To be sure, that is probably a bit of an exaggeration. The administrative record is over 65 binders of material, and we doubt that any one human being, not otherwise familiar with the record as it was compiled in real time, could "carefully" review it all. (Cf. Hiser v. Bell Helicopter Textron Inc. (2003) 111 Cal.App.4th 640, 656 [4 Cal.Rptr.3d 249] ["We are not required to make an independent search of this voluminous record and may disregard any claims where no reference is furnished."].) That said, this trial judge most certainly reviewed the important parts: We found his tabs on various portions of it, which apparently were not removed as the boxes of binders made their trip over to this court.
[10] Section 40402 provides:

"The Legislature finds and declares all of the following:
"(a) That the South Coast Air Basin is a geographical entity not reflected by political boundaries.
"(b) That the basin is acknowledged to have critical air pollution problems caused by the operation of millions of motor vehicles in the basin, stationary sources of pollution, frequent atmospheric inversions that trap aerial contaminants, and the large amount of sunshine that transforms vehicular and nonvehicular emissions into a variety of deleterious chemicals.
"(c) That these critical air pollution problems are most acute in the foothill communities of the San Gabriel/Pomona Valleys and the Riverside/San Bernardino areas, where pollutants which originate in other parts of the basin are trapped by geographical and meteorological conditions characteristic of these areas.
"(d) That the state and federal governments have promulgated ambient air quality standards for the protection of public health, and it is in the public interest that those standards not be exceeded.
"(e) That, in order to achieve and maintain air quality within the ambient air quality standards, a comprehensive basinwide air quality management plan must be developed and implemented to provide for the rapid abatement of existing emission levels to levels which will result in the achievement and maintenance of the state and federal ambient air quality standards and to ensure that new sources of emissions are planned and operated so as to be consistent with the basin's air quality goals.
"(f) That, in recognition of the fact that some regions within the basin face more critical air pollution problems than others, it is necessary for the basinwide air quality management plan to consider the specific air pollution problems of regions within the air basin in planning for facilities which create new sources of emissions.
"(g) That, in order to successfully develop and implement a meaningful strategy for achieving and maintaining ambient air quality standards, local governments in the South Coast Air Basin must be delegated additional authority from the state in the control of vehicular sources and must retain existing authority to set stringent emission standards for nonvehicular sources.
"(h) That, in order to successfully implement a comprehensive program for the achievement and maintenance of state and federal ambient air quality standards in the South Coast Air Basin, the responsibilities of local and regional authorities with respect to air pollution control and air quality management plan adoption must be fully integrated into an agency with basinwide authority, largely to be governed by representatives of county and city governments."
[11] The complete text of section 40440 is:

"(a) The south coast district board shall adopt rules and regulations that carry out the plan and are not in conflict with state law and federal laws and rules and regulations. Upon adoption and approval of subsequent revisions of the plan, these rules and regulations shall be amended, if necessary, to conform to the plan.
"(b) The rules and regulations adopted pursuant to subdivision (a) shall do all of the following:
"(1) Require the use of best available control technology for new and modified sources and the use of best available retrofit control technology for existing sources.
"(2) Promote cleaner burning alternative fuels.
"(3) Consistent with Section 40414, provide for indirect source controls in those areas of the south coast district in which there are high-level, localized concentrations of pollutants or with respect to any new source that will have a significant effect on air quality in the South Coast Air Basin.
"(4) Provide for transportation control measures, as listed in the plan.
"(c) The south coast district board shall adopt rules and regulations that will assure that all its administrative practices and the carrying out of its programs are efficient and cost-effective, consistent with the goals of achieving and maintaining federal and state ambient air quality standards and achieving the purposes of this chapter.
"(d) The south coast district board shall determine what is the best available retrofit control technology for existing electric plants, and shall adopt rules and regulations requiring the use of the best available retrofit control technology in existing electric plants, if the board finds and determines that to do so is necessary to carry out the plan.
"(e) In adopting any regulation, the south coast district board shall comply with Section 40703."
[12] Here is a quick bibliography of the published decisions in the area:

Security Environmental Systems, Inc. v. South Coast Air Quality Management Dist. (1991) 229 Cal.App.3d 110 [80 Cal.Rptr. 108] (Security Environmental). This decision involved whether mitigation measures requiring best available technology were necessary to construct a hazardous waste incineration facility after a delay since permits had actually been issued.
Dunn-Edwards Corp. v. South Coast Air Quality Management Dist. (1993) 19 Cal.App.4th 536 [4 Cal.Rptr.2d 99]. This case is essentially a process case, challenging what the plaintiff contended was an improper delegation of authority to a technical review group.
Sherwin-Williams Co. v. South Coast Air Quality Management Dist. (2001) 86 Cal.App.4th 1258 [104 Cal.Rptr.2d 288]. This case is essentially an environmental-impact-report-style challenge to the 1996 version of the rule, that is, arguing, just as an environmental activist group would argue that an environmental impact report does not consider various factors, neither did the district consider required factors (e.g., socioeconomic impacts) in promulgating the 1996 rule.
Western States Petroleum Assn. v. South Coast Air Quality Management Dist. (2006) 136 Cal.App.4th 1012 [9 Cal.Rptr.3d 354] (Western States). Western States involved regulations of small particulate matter from oil refineries.
[13] In Western States, the trade group alleged that the rule governing fine particulate matter was "neither feasible nor cost effective." (Western States, supra, 136 Cal.App.4th at p. 1018.) And in National Paint Association II the paint association apparently seized on the word "feasible" as well. (See National Paint Association II, supra, 485 F.Supp.2d at p. 1158.) "Feasible," however, is not the word the Legislature chose, and the court in National Paint Association II treated the paint association's feasibility challenge as an achievability challenge. (See id. at pp. 1158-1159 [court segues from discussing feasibility to achievability].) We follow suit. Our analysis must be based on the words chosen by the Legislature.
[14] Thus the metaphor is probably not the most propitious for those who believe that the law can decree a technological result and the result will follow.
[15] See generally Exodus, chapter 5.
[16] Perhaps in deference to the obvious possibilities of hardship in technology forcing rules, even those courts that have embraced the "Make it so, Number One" approach have articulated a need for escape valves. Such was the case in United Steelworkers, which, like Canute, recognizing that some things might not be amenable to mere decree, noted that variance provisions are integral to any technology forcing statute: "The ironic truth is that `technology-forcing' makes the agency's standard of proof somewhat circular. Since the agency must hazard some predictions about experimental technology, it may not be able to determine the success of new means of compliance until industry implements them.... Conversely, OSHA or the courts may discover that a standard is infeasible only after industry has exerted all good faith efforts to comply.... Both the agency, in issuing, and the court, in upholding, a standard under this principle obviously run the risk that an apparently feasible standard will prove technologically impossible in the future. But, while we will address below the complexities of this issue, we note the general agreement in the courts that such flexible devices as variance proceedings can correct erroneous predictions about feasibility when the error manifests itself, and thus can reduce this risk." (United Steelworkers, supra, 647 F.2d at p. 1266, italics added, citations omitted.) In fact, the United States Supreme Court has actually required variance proceedings. (E. I. du Pont de Nemours & Co. v. Train (1977) 430 U.S. 112 [51 L.Ed.2d 204, 97 S.Ct. 965].)
[17] Reviewing Friedman, Total Justice (1985).
[18] Here is the complete text of section 40723:

"(a) It is the intent of the Legislature that, when an air district establishes best available control technology or lowest achievable emission rate requirements based in part on vendor representations, the requirements be achievable for the applicable source category.
"(b) Upon the request of any owner or operator of equipment that is subject to best available control technology or lowest achievable emission rate requirements, the district shall review whether the applicable requirements have been achieved and whether the requirements should be required for the source category or source if the owner or operator demonstrates that all of the following conditions are true:
"(1) The owner or operator purchased equipment that was subject to or intended by the manufacturer or vendor to satisfy federal, state, or local air district rules or permitting requirements that impose best available control technology or lowest achievable emission rate requirements.
"(2) An express warranty was provided to the owner or operator by the manufacturer or vendor that the equipment would achieve the best available control technology or lowest achievable emission rate requirements, or any specified emission rate or standard intended to satisfy those requirements.
"(3) The owner or operator made a reasonable effort, for a reasonable period of time, to operate the equipment in accordance with the operating conditions specified by the equipment manufacturer or vendor.
"(4) The equipment failed to meet the best available control technology or lowest achievable emission rate requirements covered by the warranty provided by the equipment manufacturer or vendor.
"(5) The applicable best available control technology or lowest achievable emission rate requirements were established primarily on the basis of the representations and data provided by the equipment manufacturer or vendor.
"(c)(1) If, after conducting a review pursuant to subdivision (b), the district determines that the applicable best available control technology or lowest achievable emission rate requirements are not achievable by a source, the district shall revise those requirements to a level achievable by that source.
"(2) If, after conducting a review pursuant to subdivision (b), the district determines that the applicable best available control technology or lowest achievable emission rate requirements are not achievable by a source category, the district shall revise those requirements to a level achievable by that source category.
"(d) This section shall be implemented in a manner consistent with applicable federal and state statutes, regulations, and requirements for the establishment of best available control technology and lowest achievable emission rate requirements."
[19] This is a point on which we respectfully part company with the federal district court in National Paint Association II. That court dismissed out of hand any light that section 40723 might shed on the phrase "best available" because the statute was not directed at "best available retrofit control technology," only "best available control technology." (See National Paint Association II, supra, 485 F.Supp.2d at p. 1160, fn. 21.)
[20] Section 40922 provides in full:

"(a) Each plan prepared pursuant to this chapter shall include an assessment of the cost effectiveness of available and proposed control measures and shall contain a list which ranks the control measures from the least cost-effective to the most cost-effective.
"(b) In developing an adoption and implementation schedule for a specific control measure, the district shall consider the relative cost effectiveness of the measure, as determined under subdivision (a), as well as other factors including, but not limited to, technological feasibility, total emission reduction potential, the rate of reduction, public acceptability, and enforceability."
[21] While subdivision (d)(1)(C)(2) of section 40916 provides that "(2) Nothing in this subdivision shall limit or affect the ability of a district to adopt or enforce rules related to architectural paint or coatings," that doesn't mean that the statute is not available to shed light on the existing scope of a district's authority as delineated elsewhere. Subdivision (d)(1)(C)(2) in fact then goes on to say that "Every rule adopted by a district regarding architectural paint or coatings shall be adopted by the governing board of the district in accordance with existing law, and shall include at least one public workshop." (Italics added.)
[22] Here is the entirety of section 40440.11:

"(a) In establishing the best available control technology that is more stringent than the lowest achievable emission rate pursuant to federal law for a proposed new or modified source, the south coast district shall consider only control options or emission limits to be applied to the basic production or process equipment existing in that source category or a similar source category.
"(b) In establishing the best available control technology for a source category or determining the best available control technology for a particular new or modified source, when a particular control alternative for one pollutant will increase emissions of one or more other pollutants, the south coast district's cost-effectiveness calculation for that particular control alternative shall include the cost of eliminating or reducing the increases in emissions of the other pollutants as required by the south coast district.
"(c) Prior to revising the best available control technology guideline for a source category to establish an emission limit that is more stringent than the existing best available control technology guideline for that source category, the south coast district shall do all of the following:
"(1) Identify one or more potential control alternatives that may constitute the best available control technology, as defined in Section 40405.
"(2) Determine that the proposed emission limitation has been met by production equipment, control equipment, or a process that is commercially available for sale, and has achieved the best available control technology in practice on a comparable commercial operation for at least one year, or a period longer than one year if a longer period is reasonably necessary to demonstrate the operating and maintenance reliability, and costs, for an operating cycle of the production or control equipment or process.
"(3) Review the information developed to assess the cost-effectiveness of each potential control alternative. For purposes of this paragraph, `cost-effectiveness' means the annual cost, in dollars, of the control alternative, divided by the annual emission reduction potential, in tons, of the control alternative.
"(4) Calculate the incremental cost-effectiveness for each potential control option. To determine the incremental cost-effectiveness under this paragraph, the district shall calculate the difference in the annual dollar costs, divided by the difference in the annual emission reduction between each progressively more stringent control alternative, as compared either to the next less expensive control alternative, or to the current best available control technology, whichever is applicable.
"(5) Place the best available control technology revision for a source category proposed under this subdivision on the calendar of a regular meeting agenda of the south coast district board, for its acceptance or further action, as the board determines.
"(d) If the proposed control option is more stringent than the lowest achievable emission rate for a source category pursuant to federal law, the south coast district shall not establish an emission limit for best available control technology that is conditioned on the use of a particular control option unless the incremental cost-effectiveness value of that option is less than the district's established incremental cost-effectiveness value for each pollutant. Notwithstanding any other provision of law, the south coast district shall have the discretion to revise incremental cost-effectiveness value for each pollutant, provided it holds a public hearing pursuant to Section 40440.10 prior to revising the value.
"(e) After the south coast district determines what is the best available control technology for a source, it shall not change that determination for that application for a period of at least one year from the date that an application for authority to construct was determined to be complete by the district. For major capital projects in excess of ten million dollars ($10,000,000), after the applicant has met and conferred with the south coast district in a preapplication meeting, the south coast district executive officer may approve existing best available control technology for the project, for a longer time period as long as the final design is consistent with the initial, preliminary project design presented in the preapplication meeting."
[23] Another way to do that is by section 40440.1, which authorizes the district to institute a cap and trade program. Subdivision (a) of section 40440.1 provides: "A market-based incentive program adopted pursuant to Section 39616 in the south coast district shall achieve emission reductions across a spectrum of sources by allowing for trading of emissions trading units for quantifiable reductions in emissions from a significant number of different sources, including mobile, area, and stationary, which are within the district's jurisdiction or which the district is authorized to include in a market-based emissions trading program."
[24] We have granted the district's request to take judicial notice of certain parts of the legislative history of Senate Bill No. 151 (1987-1988 Reg. Sess.) in 1987. While those items (basically three Senate committee reports) do indicate that the purpose of the bill was to "encourage more aggressive improvements in air quality," there is nothing in the reports' discussion of best available control technology or best available control retrofit technology to indicate that the Legislature intended to give the district the authority to require what does not yet exist. In fact, like the legislation itself, the committee reports still use the key words "available" and "achievable" and give no indication that the district could impose rules requiring projected technology.